IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 30, 2009

Charles R. Fulbruge III
Clerk

No. 06-20596

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ANANT MAUSKAR,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before PRADO, ELROD, and HAYNES, Circuit Judges.

JENNIFER W. ELROD, Circuit Judge:

Defendant-Appellant Anant Mauskar was convicted of twenty-one counts of defrauding Medicare and Medicaid, sentenced to 135 months in prison, and ordered to make restitution of $14,427,242. He appeals his conviction and sentence on numerous grounds. For the reasons set forth below, we affirm the judgment of the district court.

FACTS AND PROCEEDINGS

Viewed in the light most favorable to the jury's verdict, the record establishes that Anant Mauskar, a licensed physician, engaged in a conspiracy to defraud Medicare by falsely certifying that he had personally provided or supervised physical therapy services to patients of the Mirage Medical Group

operated by Tonya Williams and Kimberly Selders. To effectuate this fraud, Williams paid Mauskar during the fall of 1999 to sign patient charts certifying that he had provided or supervised physical therapy services despite the fact that he had not done so. When asked by a Medicare fraud investigator whether he had actually performed or personally supervised physical therapy services for patients of the Mirage Medical Group, Mauskar stated that he had even though he had not.

Applying the same standard, the record also establishes that Mauskar conspired to defraud Medicare and Medicaid by falsely certifying that patients needed motorized wheelchairs and by performing unnecessary medical procedures and tests on those patients. "Recruiters" compensated for their efforts brought an enormous number of patients to Mauskar's office to facilitate this fraud; in 2002, for example, Mauskar prescribed 1,766 wheelchairs. Durable medical equipment ("DME") companies used Mauskar's certificates of medical necessity to obtain payment for medically unnecessary wheelchairs. The companies compounded the fraud by delivering less expensive scooters to the patients, rather than the motorized wheelchairs for which the government was charged.

Mauskar was indicted on numerous charges relating to this conduct. His first trial ended in a hung jury, and the district court declared a mistrial sua sponte on April 4, 2005. Approximately two weeks before his second trial, Mauskar filed a motion to dismiss count 1 of the indictment on grounds of duplicity,[1] which the district court denied. During his second trial, testimony from Tonya Williams revealed that she had forged some progress notes, charges sheets, and other documents by photocopying Mauskar's signature, and that the government knew of these forgeries well before Mauskar's first trial. Mauskar

---

[1] In this context, "'[d]uplicity' occurs when a single count in an indictment contains two or more distinct offenses." United States v. Miller, 520 F.3d 504, 512 (5th Cir. 2008).

filed a motion to dismiss the indictment due to outrageous government conduct and/or due to violation of the Double Jeopardy Clause, alleging that the government had committed an egregious Brady violation by failing to disclose the forgeries during Mauskar's first trial. The district court denied the motion, and the jury convicted Mauskar on twenty-one counts of health care fraud and acquitted him on four counts. The district court sentenced Mauskar to 135 months in prison and ordered him to make restitution of $14,427,242. Mauskar appeals his conviction and sentence.

DISCUSSION

I. Jurisdiction

We first consider the government's suggestion in a footnote of its brief that we lack jurisdiction to consider Mauskar's challenges to his conviction because his notice of appeal indicates an intent to appeal only his sentence. United States v. Pineda, No. 92-2518, 1993 WL 209937 (5th Cir. June 3, 1993), forecloses this argument. See 5th Cir. R. 47.5.3 (providing that unpublished opinions issued before January 1, 1996, are precedent). Like Mauskar, the defendant in Pineda "designate[d] his sentence, but not his conviction" in his notice of appeal, but his "intent to appeal his conviction [was] readily apparent in his brief" and "the Government . . . fully responded to [his] arguments." Id. at *3. Noting that precedent mandates broad construction of the second clause of Federal Rule of Appellate Procedure 3(c), which requires a notice of appeal to "designate the judgment or order from which an appeal is taken," the court "liberally construe[d] Pineda's notice of appeal to include a challenge to his conviction as well as his sentence." Id. (quoting United States v. Ramirez, 932 F.2d 374, 375 (5th Cir. 1991)). Following this precedent, we hold that we have jurisdiction to consider Mauskar's challenges to his conviction.

II.    Duplicity

    A.    Mauskar's motion to dismiss count 1 of the indictment on grounds of duplicity was timely.

Before reaching the substance of Mauskar's motion to dismiss count 1 of the indictment on grounds of duplicity, we address a procedural issue. Mauskar filed his motion approximately two weeks before his second trial. The district court denied the motion on the grounds that it was untimely and that a unanimity instruction would be given to protect Mauskar's rights. The government, reasoning that Federal Rule of Criminal Procedure 12 required Mauskar to file the motion before his first trial, argues that the district court was correct in holding the motion untimely.

Rule 12 requires that a motion to dismiss an indictment on the ground of duplicity be filed "before trial." See United States v. Payne, 341 F.3d 393, 402 (5th Cir. 2003). It does not, however, address the question raised by the government here, which is whether a defendant who fails to challenge a duplicitous indictment before a trial ending in a mistrial is barred from raising the challenge before a subsequent trial on the same indictment. No controlling authority exists, but the long-established principle that "[t]he declaration of a mistrial renders nugatory all trial proceedings with the same result as if there had been no trial at all" militates strongly against the government's position. See United States v. Pappas, 445 F.2d 1194, 1201 (3d Cir. 1971) (internal quotation marks and citations omitted); see also United States v. Groth, 682 F.2d 578, 580 (6th Cir. 1982) ("We agree with the trial judge . . . that the prosecution is not bound by its first waiver. The waiver referred to the earlier trial . . . . Once a mistrial was declared each party was free to assert or waive his rights."). We apply this principle and hold that Mauskar's motion to dismiss the indictment was timely filed.

B.     Count 1 of the indictment is not duplicitous.

"We review de novo a claim than an indictment is duplicitous." Miller, 520 F.3d at 512. "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'" United States v. Cooper, 966 F.2d 936, 939 (5th Cir. 1992) (quoting Braverman v. United States, 317 U.S. 49, 54 (1942)). An indictment's allegations, and not the evidence adduced at trial, control whether the indictment is duplicitous:

> In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than just one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count.

United States v. McDermot, No. 93-3603, 1995 WL 371036, at *4 (5th Cir. June 5, 1995) (emphasis added) (quoting United States v. Mastelotto, 717 F.2d 1238, 1244 (9th Cir. 1983), overruled on other grounds by United States v. Miller, 471 U.S. 130 (1985)); see also United States v. Sharpe, 193 F.3d 852, 866 (5th Cir. 1999) (rejecting duplicity allegation where count "[could] be read to allege only one violation"). That an indictment alleges more than one means by which conspirators "sought to accomplish [a] scheme does not render it duplicitous." McDermot, 1995 WL 371036, at *4 (citing Owens v. United States, 221 F.2d 351, 354 (5th Cir. 1955)).

The government correctly argues that Mauskar's indictment in the present case is not duplicitous, as it can be read to charge a single conspiracy involving Mauskar and others with three objects. The indictment sets forth those objects as follows:

a.     To violate the Health Care Fraud Statute, that is, to knowingly and willfully execute and attempt to execute a scheme and artifice: (1) to defraud a health care benefit program, namely the Medicare and Medicaid programs; and

5

(2) to obtain, by means of material false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, health care benefit programs, namely Medicare and Medicaid; in connection with the delivery of or payment for health care benefits, items and services, namely physical therapy services, in violation of Title 18, United States Code Section 1347;

b.   To violate the Health Care Fraud statute, that is, to knowingly and willfully execute and attempt to execute a scheme and artifice: (1) to defraud a health care benefit program, namely the Medicare and Medicaid programs; and (2) to obtain, by means of material false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, health care benefits programs, namely, Medicare and Medicaid; in connection with the delivery of and payment for health care benefits, items and services, namely power wheelchairs, in violation of Title 18, United States Code Section 1347; [and]

c.   To violate the Anti-Kickback statute by knowingly and willfully soliciting and receiving any remuneration (including any kickback) directly or indirectly, overtly or covertly, in cash or in kind to induce the referral of Medicare and Medicaid beneficiaries for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Medicare and Medicaid programs, in violations of Title 42 U.S.C. § 1320a-7b(b)(2)(A).

The fact that the evidence at trial may have established two distinct conspiracies—one between Mauskar and persons associated with the Mirage Medical Group and another between Mauskar and persons associated with the DME companies—is irrelevant to the duplicity analysis.

C.    Assuming arguendo that count 1 is duplicitous, no prejudice resulted.

        1.    <u>The district court's unanimity instruction to the jury was sufficient to guard against a non-unanimous verdict</u>.

The district court gave the jury the following unanimity instruction:

> Your verdict, whether it is guilty or not guilty, must be unanimous. The following instruction applies to the unanimity requirement as to count one.
>
> As I have explained, count one of the second superseding indictment accuses the defendant of committing the crime of conspiracy in up to three different ways. We went over this. The first is the defendant conspired to commit health care fraud in connection with the delivery of or payment for physical therapy services. The second is the defendant conspired to commit health care fraud in connection with the delivery of or payment for durable medical equipment, namely power wheelchairs. And the third is that the defendant conspired to solicit or receive remuneration in return for referring Medicare and Medicaid patients.
>
> The government does not have to prove all three of these objects of conspiracy for you to return a verdict of guilty on this charge. Proof beyond a reasonable doubt on one object of the conspiracy is enough. But in order to return a guilty verdict, all twelve of you must agree that the same one has been proved. All of you must agree that the government proved beyond a reasonable doubt that the defendant conspired to commit health care fraud in connection with the delivery of or payment for physical therapy services, or all of you must agree that the government proved beyond a reasonable doubt that the defendant . . . conspired to commit health care fraud in connection with the delivery of or payment for durable medical equipment, or all of you must agree that the government proved beyond a reasonable doubt that the defendant conspired to solicit or receive remuneration in return for referring Medicare and Medicaid patients. In other words, if four of you believe A was proved and four of you believe B was proved and four of you believe C was proved, you're not unanimous. Everybody has to agree on the same one for you to find a guilty verdict.

> Now, of course all of you may also agree that the conspiracy, if you have so found, has had as its object the commission of more than one of the alleged federal offenses, so long as you are unanimous on each of the federal offenses.

This instruction was sufficient to guard against a non-unanimous verdict. See United States v. Fisher, 106 F.3d 622, 633 (5th Cir. 1997) (holding a specific unanimity instruction "sufficient to cure any alleged defect in the indictment"), abrogated on other grounds by Ohler v. United States, 529 U.S. 753 (2000). Notwithstanding Mauskar's suggestion to the contrary, the ambiguity of the verdict as to which object or objects of the conspiracy the jury unanimously agreed upon does not change this result.

### 2. Count 1 did not violate Mauskar's rights under the Double Jeopardy Clause.

Mauskar argues without citation to authority that "Count One . . . diminished [his] right to be free from Double Jeopardy" because (1) "[a]ssuming . . . that the jury unanimously agreed that one means submitted to them was proven and the other two were not, then a third trial would place Mauskar in jeopardy of conviction on a theory that was unanimously rejected"; and (2) "it's possible that the jury in the first trial . . . unanimously agreed that Mauskar was not guilty of one of the conspiracies entailed in Count One but could not decide the issue as to any one of the other theories, thereby contributing to the mistrial." We review the district court's denial of Mauksar's "motion to dismiss [the] indictment on double jeopardy grounds de novo and accept the underlying factual findings of the district court unless clearly erroneous." United States v. Gonzales, 76 F.3d 1339, 1342 (5th Cir. 1996).

Mauskar's first argument is irrelevant, as the possibility that the Double Jeopardy Clause would bar a third trial has no bearing on the disposition of

Mauskar's present appeal.[2] His second argument does not account for the fact that Mauskar's first trial ended as a result of the jury's failure to reach a verdict. "It has been established . . . since the opinion of Justice Story in United States v. Perez, 9 Wheat. 579, 6 L. Ed. 165 (1824), that a failure of the jury to agree on a verdict was an instance of 'manifest necessity' which permitted a trial judge to terminate the first trial and retry the defendant . . . ." Richardson v. United States, 468 U.S. 317, 323–24 (1984). In Richardson, the petitioner argued that the Double Jeopardy Clause barred his retrial on federal drug charges after the jury in his first trial convicted him on one count but was unable to reach a verdict on two others. Id. at 318, 322–23. The Court rejected this argument, holding that the "Double Jeopardy Clause by its terms applies only where there has been some event . . . which terminates the original jeopardy" and that "the failure of the jury to reach a verdict is not an event which terminates jeopardy." Id. at 325; see also United States v. Miller, 952 F.2d 866, 874 (5th Cir. 1992) ("Following Richardson, we hold that double jeopardy does not bar this retrial, and because under Richardson jeopardy has not terminated, double jeopardy will not be available as a ground for challenging any subsequent conviction that may result."). In support of its holding, the Court observed that despite Oregon v. Kennedy, 456 U.S. 667 (1982), and other cases "examin[ing] the application of double jeopardy principles to mistrials granted for reasons other than the inability of the jury to agree," it had "constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause." Richardson, 468 U.S. at 324. This authority forecloses Mauskar's argument that the Double Jeopardy Clause barred his second trial. See United States v. Achobe, No. 06-20229, 2008 WL 5255896, at *6 (5th Cir. Dec. 18, 2008).

---

[2] Nevertheless, we note that the government conceded during oral argument that the Double Jeopardy Clause would preclude any future trial of Mauskar for conduct described in count 1.

### 3. The ambiguity of the jury's general verdict as to count 1 of the indictment did not adversely affect Mauskar's sentence.

Mauskar correctly argues that the jury's general verdict as to count 1 does not reveal which of the conspiracy's objects the jury found Mauskar to have committed. This ambiguity, however, did not adversely affect Mauskar's sentence. Under U.S.S.G. § 1B1.2(d), "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." This provision applies "with respect to an object offense if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit the object offense." Id. § 1B1.2 cmt. n.4. As discussed below in section III, "[m]ore than sufficient evidence exists from which the district court, sitting as a trier of fact, could have found that" Mauskar conspired to defraud the government both by submitting false claims for physical therapy services and by unnecessarily prescribing motorized wheelchairs. Moreover, the district court expressly declined to consider the third object offense of the conspiracy—soliciting or receiving kickbacks—in determining Mauskar's sentence:

> The ninth objection is to Paragraph 27, objecting to the defendant's statement that Nadine Norman received financial kickbacks from the DME suppliers and that defendant received those as well through Nadine Norman.
>
> There is some evidence that the Court is able to consider with respect to that possibility. However, after having sat through two trials on this general subject and having heard all that I've heard, I find that the government has not presented sufficient proof . . . that there were kickbacks being paid for me to . . . deny that objection; and, therefore, that objection will be sustained.

Mauskar thus cannot establish that the verdict's ambiguity as to count 1 caused any error in his sentencing.

10

III.    Sufficiency of the Evidence

Mauskar raises numerous challenges to the sufficiency of the evidence to support his conviction.  Our inquiry in assessing such challenges in a criminal case is whether a "reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt."  United States v. Mergerson, 4 F.3d 337, 341 (5th Cir. 1993) (quoting United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc)).  We view "all evidence and all reasonable inferences drawn from it in the light most favorable to the government."  Id.

A.    Count 1

Count 1 of the indictment alleges a single conspiracy with three objects: (1) defrauding Medicare by a scheme relating to physical therapy services; (2) defrauding Medicare and Medicaid by a scheme relating to motorized wheelchairs; and (3) violating the anti-kickback statute by soliciting and receiving remuneration to induce referral of Medicare and Medicaid beneficiaries.  To convict Mauskar of conspiracy, the government had to show:

> (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

United States v. Williams, 507 F.3d 905, 910 n.4 (5th Cir. 2007), cert. denied, 128 S. Ct. 2074 (2008) (quoting United States v. Peterson, 244 F.3d 385, 389 (5th Cir. 2001)).  "[E]ach element may be proven by circumstantial evidence," United States v. Mulderig, 120 F.3d 534, 547 (5th Cir. 1997), and proof of a tacit conspiratorial agreement is sufficient,  United States v. Freeman, 434 F.3d 369, 376 (5th Cir. 2005).  Notwithstanding Mauskar's argument to the contrary, the government need have proved only one object of the conspiracy for us to sustain his conviction on count 1: "[A] general guilty verdict on a multiple-object conspiracy may stand even if the evidence is insufficient to sustain a conviction

11

on one of the charged objects." United States v. Mann, 493 F.3d 484, 492 (5th Cir. 2007) (quoting United States v. Calle, 120 F.3d 43, 45 (5th Cir. 1997)). Applying this framework, the record contains ample evidence, some of which is discussed below, to support Mauskar's conviction on count 1.

B.      Counts 2, 4, 6, and 9

Counts 2, 4, 6, and 9 relate to Mauskar's false certification that he provided physical therapy services to Mirage patients. Mauskar's only challenge to the sufficiency of the evidence supporting these counts is that he did not understand that by signing a patient's chart, he certified that he had performed physical therapy services for that patient. The record reflects, however, that Mauskar signed a Medicare form on September 9, 1999, certifying that he directly supervised physical therapy services in a patient's home. The record also reflects that Mauskar told a Medicare investigator that Mirage patients came to his office for treatment, when in fact they did not. This evidence, as well as other evidence in the record, is sufficient to establish Mauskar's culpability in falsely certifying his treatment of Mirage patients.

C.      Counts 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, and 40

Counts 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, and 40 relate to Mauskar's prescription of motorized wheelchairs to Medicare and Medicaid patients who did not need them. Mauskar first argues that "[t]here was no evidence [he] willingly and knowingly assisted [the DME companies] in their scheme to defraud." To the contrary, the record is replete with such evidence. It is undisputed, for example, that Mauskar prescribed a motorized wheelchair to Herman Conway despite the fact Conway was jogging a mile twice a day at the time Mauskar examined him. Conway testified that he used the scooter for "recreational purposes."

Mauskar next argues that the DME companies' alteration of the certificates of medical necessity he signed forecloses his conviction on all of the above-referenced counts but one. This argument fails for at least two reasons. First, the DME companies' alteration of the certificates does not affect the evidence that Mauskar himself fraudently billed medically unnecessary tests and evaluations irrelevant to the procurement of a motorized wheelchair. Second, the alteration of the certificates for the purpose of ensuring the government would accept them does not diminish Mauskar's responsibility for signing the certificates. If he had not signed them, the government would not have suffered the losses it did.

Finally, Mauskar argues that "[t]here was no evidence presented that . . . Mauskar knew that [the DME companies] were delivering less expensive scooters while billing Medicare for motorized wheelchairs." The record belies this assertion. One of the patients to whom Mauskar prescribed a motorized wheelchair testified that Mauskar asked her if she wanted a scooter:

> Q. Now, let me show you what's marked with Bates 1217. Did Dr. Mauskar ask you if you needed a motorized wheelchair because you needed help moving in around your home, your house?
> A. Yes, he asked me did I want a wheel -- a motor -- a scooter. A scooter.
> Q. He asked if you wanted a scooter?
> A. Uh-huh.
> Q. He said specifically "a scooter"?
> A. A scooter, uh-huh.

Another patient testified she told Mauskar's receptionist that she had come to "see the physician about a motor scooter." This, along with other evidence in the record, is sufficient to support an inference that Mauskar knew the DME companies were providing his patients with scooters rather than motorized wheelchairs. Moreover, even assuming Mauskar had been ignorant of the fact the DME companies charged the government for motorized wheelchairs and

delivered less expensive scooters, the evidence would be sufficient to support his conviction on the counts at issue—the DME companies' compounding the fraud by delivering scooters did not relieve Mauskar of his responsibility for falsely certifying patients' eligibility for motorized wheelchairs.

IV.    Brady and Outrageous Government Conduct

The record establishes that before Mauskar's first trial, the government knew Tonya Williams had forged Mauskar's signature on treatment charge sheets, progress notes, and other documents.   Williams testified on cross examination during Mauskar's second trial that the government had been aware of the forgery for more than two years:

> Q:    Who did you tell that you had been photocopying Dr. Mauskar's signature?
> A:    Mr. Louis, Mr. McGregor.
> Q:    And was this at a meeting you had at the U.S. Attorney's Office?
> A:    Yes.
> Q:    And it was before the trial began?
> A:    Yes.
> Q:    Is it while you were in prison or before you went to prison?
> A:    Before I went to prison.
> Q:    So, the government has known for at least for the last two years that you photocopied these signatures.
> A:    (Nods head.)
> Q:    Yes or no?
> A:    Yes.

The government concedes that at least some of these documents were relevant to some of the charges against Mauskar, and that it failed to disclose the forgeries until after Mauskar's second trial was underway. Following Williams's testimony, Mauskar moved for dismissal of the indictment due to outrageous government conduct and/or violation of the Double Jeopardy Clause, alleging that the government committed an egregious Brady violation by failing to disclose the forgery.

"To make out a Brady violation, a defendant must show that (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." Miller, 520 F.3d at 514 (internal quotation marks and citations omitted). "Evidence is material under Brady when there is a 'reasonable probability' that the outcome of the trial would have been different if the suppressed evidence had been disclosed to the defendant." United States v. Runyan, 290 F.3d 223, 245 (5th Cir. 2002). Mauskar, however, fails on appeal to identify the forged documents with any specificity, or to explain to which charges the documents were relevant. In fact, Mauskar acknowledges that he was acquitted on some of those charges. Without this information, we cannot conduct the analysis necessary to determine whether the documents were "material" within the meaning of Brady. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more."); see also Smith v. Black, 904 F.2d 950, 967 (5th Cir. 1990) (observing that "[t]he materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the [government]"), vacated, 503 U.S. 930 (1992), abrogated on other grounds by Stringer v. Black, 503 U.S. 222 (1992).

Nor has Mauskar established the existence of outrageous government conduct that required dismissal of his indictment, a question we review de novo. United States v. Asibor, 109 F.3d 1023, 1039 (5th Cir. 1997). "Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." United States v. Johnson, 68 F.3d 899, 902 (5th Cir. 1995) (citing United States v. Russell, 411 U.S. 423, 431–32 (1973)). "Such a violation will only be found in the rarest circumstances." Id. (citing United States v. Yater, 756 F.2d 1058, 1066 (5th Cir. 1985)); see also United

States v. Childs, 447 F.3d 541, 545 (7th Cir. 2006) (observing that "dismissing criminal charges against a defendant because of government misconduct" is an "extreme step"). We are deeply concerned by the government's failure to disclose Williams's forgery of Mauskar's signature on documents relating to the charges against him.[3] "The duty of a prosecutor, as the representative of the sovereign in a criminal case, is not that it shall win a case but that justice shall be done." Dickson v. Quarterman, 462 F.3d 470, 479 (5th Cir. 2006) (internal quotation marks and citations omitted). Nonetheless, we cannot say on the record before us that the nondisclosure in the present case is so "shocking to the universal sense of justice," Russell, 411 U.S. at 432 (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246 (U.S. 1960)), that the government should have been deprived for all time of the opportunity to prosecute Mauskar.

In so concluding, we note that contrary to Mauskar's assertion, the government did not suborn perjured testimony from Tonya Williams regarding the authenticity of signatures on the forged documents. Williams testified during Mauskar's first trial that she had never written "Dr. Mauskar's name on any Medicare application form that was submitted to Medicare." This testimony is not inconsistent with her subsequent testimony during Mauskar's second trial that she forged treatment sheets, progress notes, and other documents. Had the government suborned perjury regarding the authenticity of signatures on the forged documents relating to the charges against Mauskar, the outcome of this appeal may have been different.

V.    Sentencing Errors

Mauskar objects to numerous alleged sentencing errors in the district court. In considering these objections, we review the district court's factual

---

[3] We are also disappointed with the government's suggestion that Williams did not "forge" Mauskar's signature because she photocopied, rather than wrote, his signature onto the forged forms. Such an argument is beneath a member of the Bar representing the United States before this court.

findings for clear error and its interpretation of the Guidelines de novo. United States v. Angeles-Mendoza, 407 F.3d 742, 747 (5th Cir. 2005). "A factual finding is not clearly erroneous so long as it is plausible in light of the record as a whole." United States v. Holmes, 406 F.3d 337, 363 (5th Cir. 2005) (quoting United States v. Powers, 168 F.3d 741, 752 (5th Cir. 1999)).

A.    Mass-Marketing Enhancement

U.S.S.G. § 2B1.1(b)(2)(A) provides for a two-level enhancement if "the offense . . . was committed through mass-marketing." The commentary to section 2B1.1 defines "mass-marketing" as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit." U.S.S.G. § 2B1.1 cmt. n.4(A). "Mass-marketing" is not limited to the mass-communication methods listed in the commentary, as the definition "explicitly contemplates 'other means' of mass-marketing." United States v. Magnuson, 307 F.3d 333, 335 (5th Cir. 2002). As we have recognized, "[f]ace-to-face marketing [] intended to reach a large number of persons" for the purpose of facilitating health care fraud can constitute "mass-marketing." United States v. Jackson, 220 F. App'x 317, 332 (5th Cir. Mar. 2, 2007).

The district court, on the recommendation of the presentence investigation report, found section 2B1.1(b)(2)(A)(ii) applicable over Mauskar's objection that while "he may have known about" the mass-marketing, the record contained no "evidence he actually participated in that or encouraged it or developed it or planned it." Mauskar renewed his objection to the mass-marketing enhancement in a motion filed shortly after sentencing, arguing that precedent did not support the enhancement absent evidence that Mauskar was "personally involved in the mass-marketing." The district court again rejected Mauskar's argument, finding that he was "inextricably involved in the mass marketing

aspect of the offense." In support of this finding, the district court noted that "well over a thousand elderly, ambulatory Medicare beneficiaries were escorted to Defendant Mauskar's medical clinic to acquire free motorized wheelchairs" and that "Mauskar's staff used a separate sign-in sheet for the Medicare wheelchair applicants . . . [to] reduce the number of arguments . . . about who was entitled to be paid the recruiting fee for having brought in the wheelchair applicants."

The plain language of the Guidelines forecloses Mauskar's argument that the mass-marketing enhancement does not apply to his conduct. The mass-marketing enhancement is applicable if an "offense . . . was committed through mass-marketing." U.S.S.G. § 2B1.1(b)(2)(A)(ii). "'Offense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 cmt. n.1(H). And "in the case of a jointly undertaken criminal activity," relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Given this standard, the district court did not err in finding Mauskar eligible for the mass-marketing enhancement.

B.      Calculation of Loss

U.S.S.G. § 2B1.1(b)(1) provides for a twenty-level enhancement if a defendant's offense, including "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," id. § 1B1.3(a)(1)(B), resulted in a loss between $7,000,000 and $20,000,000. "Loss is the greater of actual loss or intended loss." Id. § 2B1.1 cmt. n.3(A). "'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." Id. § 2B1.1 cmt. n.3(A)(ii). "The [district] court need make only a reasonable estimate of the loss" based on available information. Id.

§ 2B1.1 cmt. n.3(C). Here, the district court estimated $15,311,867 as the total loss attributable to Mauskar and accordingly applied a twenty-level enhancement.

In his opening brief, Mauskar raises three objections to the district court's loss estimate, all of which relate to his responsibility for $13,480,000 the DME companies billed Medicare for medically unnecessary motorized wheelchairs. First, Mauskar argues that he is not responsible for an unspecified portion of that amount because the DME companies altered some certificates of medical necessity, after Mauskar signed them, to ensure that the government would accept the certificates and pay for the wheelchairs. This argument fails because the district court did not include the allegedly altered certificates in its loss calculation: "[I]n view of the questionable CMNs, which the defendant has estimated at 600 off of 2400, I'm going to be somewhat even more conservative and base my loss finding here upon the 1685 CMNs that the government was able to document out of Dr. Mauskar's own files." Even had the district court decided to include the allegedly altered certificates in its loss calculation, it would not have clearly erred. By signing the certificates of medical necessity, Mauskar verified ineligible patients' eligibility for power wheelchairs; it was entirely foreseeable from his perspective that the DME companies would use those CMNs to defraud Medicare and Medicaid.

Second, Mauskar suggests that he should not be held responsible for the $13,480,000 because he was unaware that the DME companies billed Medicare and Medicaid for power wheelchairs and delivered less expensive scooters. This argument, which Mauskar did not make before the district court, is without merit. The fact that the DME companies billed the government for power wheelchairs and delivered scooters does not absolve Mauskar from responsibility for issuing certificates of eligibility for power wheelchairs to ineligible patients, regardless of whether he knew of this additional dimension of the conspiracy.

In any event, Mauskar's failure to make this argument before the district court forecloses our review. See United States v. Guerrero, 5 F.3d 868, 871 (5th Cir. 1993) (holding that fact questions that could have been resolved by the district court upon proper objection can never constitute plain error).

Third, Mauskar asserts without explanation that "if [he] is responsible for any of the loss in this regard it should be limited to the amount paid [to] the DMEs for the specific patients whose information was presented at trial, an amount totaling $86,226[,] . . . with a reduction for the amount secured through alterations to Mauskar's prescriptions without his knowledge." To the extent Mauskar means to argue that the district court could consider only evidence presented at trial in sentencing Mauskar, his argument is without merit, as "[t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range." United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005). Further, as discussed above, the record reflects that the district court did not consider the altered CMNs in calculating the loss that resulted from Mauskar's conduct. Mauskar's argument on this point thus fails.

In his reply brief, Mauskar asserts that because the DME companies billed approximately $10,000 per patient but the government paid approximately $5,000 per patient, the district court erred in finding Mauskar responsible for eighty percent of the amount billed, rather than fifty percent. As above, Mauskar's failure to raise this argument before the district court forecloses appellate review. See Guerrero, 5 F.3d at 871. Moreover, even assuming arguendo that the district court did err on this point, the error would be harmless, as even the application of Mauskar's proposed fifty percent discount rate would not reduce the loss estimate below $7,000,000, the threshold for a twenty-level enhancement under section 2B1.1(b)(1). See United States v. Watson, 966 F.2d 161, 164 (5th Cir. 1992) ("Watson has not demonstrated that

the evidence is sufficient to reduce the value of the stolen property by . . . the amount necessary to decrease his offense level . . . . Accordingly, any error by the district court would be harmless." (citations omitted)).

    C.    Aggravating Role Enhancement

U.S.S.G. § 3B1.1(b) provides for a three-level enhancement "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Id. § 3B1.1 n.2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id. § 3B1.1 n.1. The district court applied the enhancement to Mauskar, finding by a preponderance of the evidence that he had supervised at least one criminally responsible participant, Nadine Norman, and that the criminal activity at issue was "otherwise extensive."

Mauskar raises three objections to the district court's analysis. First, he criticizes the district court's finding that Nadine Norman, Mauskar's former office manager, was a criminally responsible participant, noting that she was acquitted of all charges. To the extent this criticism constitutes an argument that Norman's acquittal precluded the district court's finding that she was a criminally responsible participant, the argument fails. See United States v. Davis, 19 F.3d 166, 172 (5th Cir. 1994) ("The district court could have enhanced Davis' sentence based on his leadership of Facey and Coulton despite their acquittals.").

Second, Mauskar asserts that "[t]he employees used to support this enhancement were not 'criminal participants' as required for application of this enhancement." This argument also fails. The court reviews the district court's preponderance-of-the-evidence factual determination that Nadine Norman was

a criminally responsible participant for clear error, and that determination is "plausible in light of the record as a whole." See United States v. Holmes, 406 F.3d 337, 363 (5th Cir. 2005). During Mauskar's first trial, for example, one witness testified that Norman (1) paid recruiters for referring patients to Mauskar's practice; (2) requested kickbacks from the medical equipment companies; and (3) controlled which recruiters could bring patients to Mauskar's office. Another witness testified that Norman received a cash payment of between seven and eight thousand dollars from a medical equipment company representative in the parking lot of Mauskar's office. Supported by this evidence, the district court's determination easily withstands clear error review.

Third, Mauskar asserts that "any supervision provided by [him] over [criminally responsible participants] was during the course and scope of their employment" and implies that this fact precludes an aggravating role enhancement. Neither the text of section 3B1.1(b) nor case law supports Mauskar's argument on this point; to the contrary, numerous courts have upheld aggravating role enhancements based on supervision of employees. See, e.g., United States v. Chau, 293 F.3d 96, 103 (3d Cir. 2002) ("Chau argues that this enhancement is improper because he merely directed his handyman, Fantom, to clean up the building . . . . However, this is sufficient for a district court to impose this enhancement."); United States v. Austin, 103 F.3d 606, 611 (7th Cir. 1997) (holding that district court's finding that a defendant's employee was a criminally responsible participant within the meaning of section 3B1.1 was not clearly erroneous).

D.    Abuse of Trust Enhancement

U.S.S.G. § 3B1.3 provides for a two-level enhancement if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The district court found section 3B1.3 applicable to Mauskar, noting that Medicare and Medicaid

relied on him to give "honest and accurate assessments" of his patients' need for power wheelchairs and physical therapy services. Mauskar argues before this court that "Medicare placed its trust in the physical therapy clinics and the DME companies, not in Mauskar." As the district court recognized, however, Medicare and Medicaid do rely on physicians such as Mauskar to provide honest assessments of their patients' needs for the medical services and products the government provides. Consistent with this fact, we have previously held that medical providers maintain a position of trust with the insurers they bill and have approved sentence enhancements for violations of that trust. See, e.g., United States v. Gieger, 190 F.3d 661, 665 (5th Cir. 1999); United States v. Iloani, 143 F.3d 921, 922–23 (5th Cir. 1998). The district court's application of section 3B1.3 is thus consistent with our precedent.

E.    Booker

After United States v. Booker, 543 U.S. 220 (2005), a criminal defendant's argument for a sentence below that prescribed by the Sentencing Guidelines can take one of two forms:

> First, [a defendant] might argue within the Guidelines' framework, for a departure from the applicable Guidelines range on the ground that his circumstances present an "atypical case" that falls outside the "heartland" to which the United States Sentencing Commission intends each individual Guideline to apply. Second, [a defendant] might argue that, independent of the Guidelines, application of the sentencing factors set forth in 18 U.S.C. § 3553(a) (2000 ed. and Supp IV) warrants a lower sentence.

Rita v. United States, 127 S. Ct. 2456, 2461 (2007) (citing Booker, 543 U.S. at 259–60). Mauskar argues that we should vacate his sentence because the district court "erroneously believed that [it] was confined to a 'heartland' analysis"—in other words, that the district court failed to recognize that application of the sentencing factors set forth in section 3553(a) might warrant a lower sentence independent of the Guidelines. To the contrary, the district

court recognized the advisory nature of the Guidelines and explicitly declined to impose a below-Guidelines sentence in reliance on the factors set forth in section 3553(a): "The Court has considered the advisory guidelines and finds that a sentence within the recommended range suggested by the advisory guidelines is appropriate to the circumstances of this case and serves the purpose of fulfilling the function of [Title] 18, United States Code, Section 3553(a)." Mauskar's argument on this point is thus without merit.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.