STRAUB, Circuit Judge,
concurring in part and dissenting in part:
I respectfully dissent from the majority’s holding that the mass-marketing enhancement under U.S. Sentencing Guidelines § 2Bl.l(b)(2)(A)(ii) “applies only if the audience of the mass-marketing was in some sense victimized by the scheme,” Maj. Op. at 712, and therefore also dissent from the majority’s remand to the District Court for further consideration of potential victimization of the audience of the mass-marketing in this case.[1]
The District Court imposed a two-level mass-marketing enhancement because the offense employed radio and television marketing to recruit straw buyers and owners of distressed properties and because the use of such marketing was integral to the success of the scheme. The majority concludes that such application was proper only if the targets of the mass-marketing were also somehow victimized by the offense.
I disagree and conclude that if the “offense” — all acts that occurred during its commission or in its preparation — employed mass-marketing, then the enhancement under U.S.S.G. § 2Bl.l(b)(2)(A)(ii) applies. See U.S.S.G. § lB1.3(a)(l) (defining “offense” to include “all acts” ... “that occurred during the commission of the offense of conviction, [or] in preparation for that offense”). Because the radio and television advertisements here were acts that *722 occurred “in preparation for” and “during the commission” of the “foreclosure rescue scheme,” I conclude the mass-marketing enhancement applies. The majority’s interpretation — requiring that the victim of the fraud also be the target of the mass-marketing — adds a condition that is not directly grounded in the text of the Guidelines.
DISCUSSION
The majority concludes that “[i]t is not enough that a scheme may be advanced by the use of mass marketing techniques; a scheme is committed through mass-marketing only when the mass marketing is directed toward individuals who will be harmed by the scheme.” (Maj. Op. at 714-15 (emphases in original).) The majority arrives at this conclusion by arguing that the text surrounding § 2B 1.1 (b)(2) focuses on victims, and therefore the mass-marketing enhancement must apply only when the marketing is targeted to victims. (Maj. Op. at 714-15.)
For the reasons stated below, I disagree that it was error for the District Court to apply the mass-marketing enhancement without first determining that the straw buyers were victims of defendants’ mass-marketing.

A. Applicable Law

Under the Sentencing Guidelines, “if the offense ... was committed through mass-marketing,” the offense level is increased two levels. See U.S.S.G. § 2Bl.l(b)(2)(A)(ii). “Mass-marketing,” in turn, means “a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit.” Id. § 2B1.1 cmt. n. 4(A). The Sentencing Commission intended this enhancement to “apply in cases in which mass-marketing has been used to target a large number of persons, regardless of the number of persons who have sustained an actual loss or injury” as a result of the offense. See U.S.S.G. app. C, amend. 617 (2003).
Significantly, the Guidelines provide a broad definition of “offense.” According to Section 1B1.1, Application Note 1(H), “ ‘Offense’ means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct)....” U.S.S.G. § 1B1.1 cmt. n. 1(H) (emphasis added). Section 1B1.3 defines “Relevant Conduct” and reads as follows:
Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[J
U.S.S.G. § lB1.3(a) (emphases added).
Two other Circuits have addressed the issue of whether, in order for the mass- *723 marketing enhancement to apply, the mass-marketing must target victims of the offense. Defendants cite to United States v. Miller, where the Eighth Circuit upheld the sentencing court’s determination that the mass-marketing enhancement did not apply because the victims of the defendant’s scheme were the lenders — i.e., financial institutions that issued loans based on fraudulent documents submitted by the defendant — and not the consumers to whom the defendant’s television commercials were directed. See 588 F.3d 560, 568 (8th Cir.2009). The Eighth Circuit reasoned that
[i]n sustaining [defendant’s] objection to the mass-marketing enhancement, the district court explained, “I don’t think the crime itself was committed through mass-marketing. The crime was the fraud that was committed on the lenders. And there was no[ ] mass-marketing involved in that....” The language of the enhancement clearly states that the offense itself must involve mass-marketing in order for the enhancement to apply. See USSG § 2Bl.l(b)(2)(A)(ii). [Defendant] participated in a mortgage fraud conspiracy involving fraud on financial institutions, not consumers, thus, we find no error in the district court’s analysis. Accordingly, the district court did not err in denying the mass-marketing enhancement under USSG § 2Bl.l(b)(2)(A)(ii).
Id. (internal citation omitted)
By contrast, the Fifth Circuit concluded that the mass-marketing enhancement applies as long as mass-marketing was used in the perpetration of the “offense.” United States v. Mauskar, 557 F.3d 219, 233 (5th Cir.2009). The defendant in Mauskar paid “recruiters” to bring patients to his office so he could perform unnecessary medical procedures and falsely certify that they needed motorized wheelchairs. Id. at 224. Durable medical equipment companies used the certificates of medical necessity issued by Mauskar to obtain payments from Medicare and Medicaid for medically unnecessary wheelchairs. Id. Mauskar argued that the sentencing court erred in applying the mass-marketing enhancement because he was not personally involved in the marketing. The Fifth Circuit rejected this argument and concluded:
The plain language of the Guidelines forecloses Mauskar’s argument that the mass-marketing enhancement does not apply to his conduct. The mass-marketing enhancement is applicable if an “offense ... was committed through mass-marketing.” U.S.S.G. § 2B1.1 (b)(2)(A)(ii). “‘Offense’ means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.” U.S.S.G. § 1B1.1 cmt. n. 1(H). And “in the case of a jointly undertaken criminal activity,” relevant conduct includes “all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.” U.S.S.G. § lB1.3(a)(l)(B).
Id. at 233.
As the Fifth Circuit subsequently elaborated, “[i]mplicit in the Mauskar court’s holding is the determination that the mass marketing efforts of the recruiters who escorted beneficiaries to the defendant’s medical clinic was ‘relevant conduct’ constituting part of the ‘offense’ of health care fraud, such that the mass marketing enhancement applied to the recruiters’ co-defendant.” United States v. Isiwele, 635 F.3d 196, 205 (5th Cir.2011) (rejecting defendant’s argument “that a mass marketing enhancement should not apply because his mass marketing efforts were not directed at the victims of the crime — here, Medicare/Medicaid.” Id. at 204.).

*724
B. Analysis

The majority concludes that for the mass-marketing enhancement to apply, “[i]t is not enough that a scheme may be advanced by the use of mass marketing techniques; a scheme is committed through mass-marketing only when the mass marketing is directed toward individuals who will be harmed by the scheme.” (Maj. Op. at 714-15 (emphases in original).) According to the majority, “an offense is ‘committed through mass-marketing’ when mass-marketing is used to recruit or deceive victims of the offense, not when mass-marketing targeted at audiences other than victims is used in connection with the fraud in some other, more tangential manner.” (Maj. Op. at 714 (emphasis in original).)
This reasoning draws a distinction between an offense that is “advanced by” mass-marketing and one “committed through” mass-marketing. The disagreement here centers on the interpretation of the terms “offense” and “committed through.” The majority focuses on the latter phrase, concluding that the enhancement does not apply because the offense was not “committed through” mass-marketing. (Maj. Op. at 714-15.) If the term “offense” included only the actual sending of false mortgage applications and defrauding the mortgage lenders, then the mass-marketing enhancement would not apply because the “offense,” i.e., the sending of false applications, was not accomplished by means of mass-marketing. But such an interpretation ignores that the Guidelines define the term “offense” broadly, so as to include the entire scheme.
The language of the Guidelines is clear: the enhancement applies “[i]f the offense ... was committed through mass-marketing.” See U.S.S.G. § 2Bl.l(b)(2)(A)(ii). “ ‘Offense’ means the offense of conviction and all relevant conduct,” see U.S.S.G. § 1B1.1 cmt. n. 1(H) (emphasis added), including “all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, [or] in preparation for that offense” and “in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts ... of others in furtherance of the jointly undertaken criminal activity.” U.S.S.G. § lB1.3(a) (emphases added).
Here, the offense of conviction is a “foreclosure rescue scheme” that proceeded in three steps. First, defendants used radio advertisements to attract both straw buyers and owners of distressed properties who were facing foreclosure. MTC advertised that anyone who bought a house through it could receive up to $50,000. Second, after locating these properties, defendants negotiated with the homeowner’s lender to sell the distressed properties to a corporate entity at low prices through a “short sale” transaction. Finally, defendants turned to their portfolio of buyer profiles, created from leads from MTC’s radio advertisements, and identified buyers to purchase the distressed properties (the straw buyers). Defendants worked with the straw buyers to apply for mortgage loans to fund the purchases, submitting fraudulent loan applications that, among other things, overstated the buyers’ income and assets. It was ostensibly a good deal for all parties involved: for the straw buyers, the defendants claimed that this was a good investment, and for the homeowners falling behind on their payments and their lenders, it was a way to sell the distressed property, albeit at less than the balance owed on the loan.
*725 Thus, defendants perpetrated their offense through the use of radio marketing. The “commission of the offense of conviction” involved running radio advertisements to attract straw buyers and owners of the properties, which was part and parcel of the scheme to defraud. Indeed, the Indictment set the stage by alleging that “[ajs part of the scheme to defraud, [the foreclosure rescue scheme] targeted homeowners who had fallen behind on their mortgage payments and whose homes were facing foreclosure by ... running radio advertisements and appearing on radio programs representing that she was a foreclosure specialist and had the ability to keep a home from going into foreclosure.” (See Indictment ¶ 8 (emphasis added)). In other words, the use of radio advertisements to attract straw buyers and property owners was “relevant conduct” constituting part of the “offense” of the foreclosure rescue scheme, such that the mass-marketing enhancement applied. Not only did the use of radio advertisements occur “during the commission of offense,” but the mass-marketing also clearly assisted defendants “in preparation for” the ultimate fraud against the mortgage lenders because MTC built up its portfolio of buyer profiles from leads that came from these advertisements. See U.S.S.G. § 1131.3(a) (defining relevant conduct to include “all acts and omissions” “that occurred during the commission of the offense of conviction ... [or] in preparation for that offense”).
I recognize that not all fraudulent schemes will rely on mass-marketing. However, the foreclosure rescue scheme at issue in this case did rely on mass-marketing in the execution and preparation of the offense; the scheme was committed through and accomplished by means of mass-marketing because the radio advertisements were an integral part of identifying straw buyers to apply for mortgages and obtaining mortgage loans through fraudulent loan applications. Accordingly, because the Guidelines define the term “offense” broadly, and because the offense here was committed through mass-marketing, I conclude that the District Court did not err in applying the mass-marketing enhancement without first finding that the targets of the mass-marketing were also victims.
The majority reasons that the text surrounding § 2B1.1 supports its conclusion that the victim must also be the recipient of the mass-marketing in order for the enhancement to apply. Because “[a]ll the other subsections of § 2Bl.l(b)(2) base enhancements on the number of victims,” “[t]he pattern thus strongly suggests that the enhancement scheme is designed to measure the scope of the wrong by the number of victims.” (Maj. Op. at 715.) I disagree. In contrast to the other subsections of § 2Bl.l(b)(2) that focus on the number of victims, the mass-marketing enhancement instead focuses on the method of solicitation employed in the offense. This is evident based on the deliberate omission of the term “victim” in § 2B1.1 (b)(2)(A)(ii), which reads as follows:
If the offense—
(A) (i) involved 10 or more victims; or
(ii) was committed through mass-marketing, increase by 2 levels;
(B) involved 50 or more victims, increase by 4 levels; or
(C) involved 250 or more victims, increase by 6 levels.
U.S.S.G. § 2Bl.l(b)(2) (emphases added).
As is apparent from the text — -and unlike the other subsections — the mass-marketing enhancement at issue here does not limit its application to victims. “Applying the rule of statutory construction ‘inclusio unius est exclusio alterius ’ — that to express or include one thing implies the *726 exclusion of the other,” United States v. Tappin, 205 F.3d 536, 540 (2d Cir.2000), it follows that the drafters did not intend to limit the application of the mass-marketing enhancement to offenses involving certain numbers of victims, since they omitted the term “victims” from U.S.S.G. § 2B 1.1(b)(2) (A) (ii), and included it in other subsections of that same provision. Unlike the other subsections that measure harm by the number of victims, the mass-marketing enhancement focuses on the particular solicitation method employed by defendants. See United States v. Fredette, 315 F.3d 1235, 1244 n. 4 (10th Cir.2003) (“[T]he enhancement for multiple victims goes to the ultimate harm caused by the defendant’s conduct, while the enhancement for mass-marketing concerns the scope and sophistication of the defendant’s fraud.”).
Furthermore, the history of § 2B1.1(b)(2)(A)(ii) indicates that it was intended to apply where the mass-marketing was used to target large numbers of persons — not necessarily just victims. The Sentencing Commission has noted that “[t]he mass-marketing alternative enhancement also will continue to apply in cases in which mass-marketing has been used to target a large number of persons, regardless of the number of persons who have sustained an actual loss or injury.” U.S.S.G. app. C, amend. 617 (2003) (emphasis added); see also United States v. Hall, 604 F.3d 539, 545 (8th Cir.2010) (“[T]he United States Sentencing Commission stated it intends the mass-marketing enhancement ‘to apply in cases in which mass-marketing has been used to target a large number of persons, regardless of the number of persons who have sustained an actual loss or injury.’” (quoting U.S.S.G. app. C, amend. 617 (2003))). Such is the case here: defendants employed radio advertisements to target large numbers of persons as part of their scheme to defraud, attracting straw buyers and owners of distressed properties as a result. Accordingly, the enhancement applies “regardless of the number of persons who have sustained an actual loss or injury.”[2]
Conclusion
For foregoing reasons, I disagree with the majority’s holding because it applies a limitation not grounded in the text of the Guidelines. Section 2B 1.1(b)(2)(A)(ii) of the Guidelines does not require that the victim and the recipient of the mass-marketing be the same person or entity; I fail to see — and the majority fails to cite to— any other Guidelines provision that requires the victim of the fraud to also be the recipient of the mass-marketing. Rather, as long as mass-marketing is used in the “offense” — meaning the offense of conviction and all relevant conduct including “all acts ... that occurred during the commission of the offense of conviction ... [or] in preparation for that offense” — then the enhancement applies. Because radio advertisements were employed “during the *727 commission of’ and “in preparation for” the offense, I conclude the District Court did not err in applying the mass-marketing enhancement. Accordingly, I respectfully dissent. I join in the remainder of the Court’s opinion.

. Because the District Court should pass on the issue in the first instance, I join the majority’s instruction that, on remand, the District Court should determine "whether the defendants engaged in ‘mass-marketing’ within the meaning of the relevant Guideline, as interpreted by the commentary.” (Maj. Op. at 717.) However, I also note (and agree with) the majority's observation that "the [trial] record contains evidence that could be found to meet the Sentencing Commission’s definition” of mass-marketing, Maj. Op. at 717, under the third enumerated category listed in the Guidelines commentary ("invest for financial profit”). See U.S.S.G. § 2B1.1 cmt. n. 4(A).

. The majority attempts to distinguish the instant case from Mauskar, where the mass-marketing enhancement was applied in the absence of any finding that the marketing efforts were directed at Medicare/Medicaid (the victims of the offense). The majority states that "although [Medicare and Medicaid recipients] did not sustain any actual financial loss under the Guidelines definition, and were thus not 'victims' as defined by the Guidelines, ... they were deceived into ordering unneeded and in some cases unprovided goods or services” and therefore "a plausible argument can be made that the deceived patients were victimized by the scheme.” (Maj. Op. at 716 (internal citations omitted.)) For the reasons stated by the majority itself, see id. at 715-16, the same is true here, but I disagree that such a finding is necessary to support application of the mass-marketing enhancement in either case.