# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
April 16, 2019

Lyle W. Cayce
Clerk

No. 17-20063

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

BENJAMIN MARTINEZ; GIAM NGUYEN; ANNA BAGOUMIAN;
DONOVAN SIMMONS,

      Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

All the defendants were convicted of conspiracy to commit health care fraud and several substantive counts of health care fraud. Individual defendants were convicted of different additional offenses. Defendants appeal, challenging the sufficiency of the evidence, the jury instructions, the exclusion of certain evidence, and one of the sentences. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a scheme to defraud Medicare orchestrated by two men: Zaven "Mike" Pogosyan and Edvard Shakhbazyan. From 2008 to 2010,

No. 17-20063

Pogosyan opened three purported medical clinics in the Houston, Texas area: the Jefferson Clinic, the Pease Clinic, and the Silver Star Clinic.[1]  Pogosyan hired defendants Dr. Nguyen, Dr. Martinez, and Dr. Simmons to serve as "Medical Directors" for these clinics.  The hiring of a physician for each clinic was essential to the scheme because a clinic cannot become a Medicare provider without an application submitted by a physician or a non-physician practitioner.  *See* 42 C.F.R. § 424.510.  Medicare will only issue the requisite provider number and remit funds to a bank account in the same name as that physician.  *Id.*

The Jefferson clinic opened first.  In September 2008, Pogosyan placed an advertisement on Craigslist for a Medical Director position.  Dr. Nguyen answered the listing and was hired at a salary of $10,000 per month.  At the direction of Pogosyan, Dr. Nguyen signed a Medicare enrollment application and opened a checking account in his own name for the receipt of Medicare payments.  Dr. Nguyen then provided Pogosyan with signed blank checks, functionally giving Pogosyan control over the account.

Shakhbazyan and Pogosyan hired and trained Seryan Mirzakhanyan to administer diagnostic tests.[2]  Defendant Anna Bagoumian was hired in April 2009 to work as a receptionist and to perform these same tests.  None of these people were licensed medical professionals or had any medical training.  After Bagoumian was hired, Mirzakhanyan became responsible for billing Medicare, a task that was previously handled by Pogosyan.

Shakhbazyan and Pogosyan used marketers to locate and recruit "patients" with the promise of cash payments.  One of these marketers was

---

[1] This clinic was also sometimes referred to as the Southwest clinic due to its location on Houston's Southwest Freeway.

[2] Mirzakhanyan was also charged in the indictment, pled guilty, and testified at trial for the government.  He testified that his training for a wide array of medical procedures took only a "couple of days."

No. 17-20063

Frank "Bones" Montgomery.[3]    Montgomery coached patients on what symptoms to describe to the doctor.  Montgomery was paid $150 in cash by Pogosyan, Mirzakhanyan, or Bagoumian for each patient he delivered to the clinic. The marketers would generally keep $50 and give $100 to the patient.

These kickback exchanges were often concealed.  Montgomery, for example, would typically retrieve an envelope with the cash from behind the medicine cabinet in a bathroom next to Dr. Nguyen's office.  On occasion, Pogosyan or Bagoumian handed him the envelope directly.  Patients were instructed to not mention the payments to the doctor, and Montgomery always drove to a secondary location before paying them.

At the Jefferson clinic, Dr. Nguyen saw patients — most of whom had been brought to the clinic by marketers — and typically ordered an extensive battery of diagnostic tests.  For a significant number of patients, the clinic submitted claims to Medicare for one or more of the following procedures: anorectal manometry, anal electromyography ("anal EMG"), and rectal sensation tests (collectively, "rectal tests").[4]

These three procedures are highly specialized and in most clinics are rarely performed.[5]  All three tests are used for assessing a patient that is suffering from either incontinence or constipation.  For obvious reasons, these tests tend to be both uncomfortable and presumably memorable for the patient.

---

[3] Montgomery was charged in the indictment, pled guilty, and also testified at trial.

[4] Based on the evidence admitted at trial, the Jefferson clinic submitted $2,650,260 in claims, for which these three procedures account for $994,346 (38%) of the total.

[5]  These correspond to procedure (billing) codes 91122, 51784, and 91120.  Anal EMGs involve the insertion of a plug or probe to measure the electrical conductivity of the nerves and muscles in the anus.  Anorectal manometry is a measurement of the pressure inside the anus or lower rectum that is generally taken by inserting a probe approximately six inches and inflating a balloon on the end of it.  The rectal sensation test is typically performed in conjunction with the anal manometry test and involves the inflation of the balloon to gauge sensation, though it can also be accomplished by inserting needles around the anus.

No. 17-20063

Despite the frequency of the billing to Medicare, no rectal tests were ever performed on a patient. The Jefferson clinic possessed medical equipment associated with these tests, but it was seemingly only used by Pogosyan or Bagoumian to fabricate test results that were placed in patient files.

After the clinic submitted claims to Medicare, payment would be remitted to the account opened by Dr. Nguyen. Pogosyan created a "management company" called Uni Office Manage, Incorporated, and instructed Mirzakhanyan to open bank accounts in its name. After Medicare paid claims, Pogosyan used the blank checks provided by Dr. Nguyen to transfer most of the money into the Uni Office accounts.[6]

Pogosyan and Shakhbazyan also instructed Mirzakhanyan to withdraw cash from the Uni Office account twice per week in amounts between $5,000-$9,000.[7] Bagoumian would also occasionally cash checks and return the money to Pogosyan and Shakhbazyan. The cash was used for the kickback scheme and for Shakhbazyan and Pogosyan's regular trips to Las Vegas.

The Jefferson clinic abruptly closed in June 2009. Pogosyan, Shakhbazyan, Mirzakhanyan, and Bagoumian shredded the entirety of the Jefferson clinic's records in a single afternoon. Pogosyan then immediately opened a new clinic on Pease Street in Houston. Dr. Nguyen and Bagoumian moved to this new clinic, but Mirzakhanyan did not.

Dr. Nguyen continued to see patients at the Pease clinic, but did not enroll with Medicare as the provider. Instead, Pogosyan placed another advertisement on Craigslist, which led to the hiring of Dr. Martinez in July 2009. At the time, Dr. Martinez lived in Dallas and was finishing the second

---

[6] From here, the money would generally be withdrawn as cash or transferred to the accounts of different companies owned by the wives of Pogosyan and Shakhbazyan.

[7] Mirzakhanyan was told to ensure all cash withdrawals were always less than $10,000, presumably to structure the transactions to avoid the filing of a Currency Transaction report. *See* 31 C.F.R. § 1010.311; 31 U.S.C. § 5324.

No. 17-20063

year of his residency. After interviewing, he agreed to travel to Houston once per month to review patient files in exchange for a monthly salary of $7,000. Like Dr. Nguyen, Dr. Martinez signed a Medicare enrollment form, opened a bank account, and turned over the checkbook to Pogosyan.

In November 2009, Pogosyan posted a second job listing for a "Medical Director" to review patient files once a month. This time Dr. Simmons responded to the posting on Craigslist. For a salary of $8,000 per month, he performed the same role as Martinez, periodically reviewing patient files from the Pease clinic. Like Dr. Nguyen and Dr. Martinez, he signed a Medicare enrollment form, opened a bank account, and signed blank checks for Pogosyan's use.

Other than the addition of Dr. Martinez and Dr. Simmons as "reviewing" doctors, the Pease clinic largely operated in the same manner as the Jefferson clinic. Bagoumian and Pogosyan employed marketers to pay patients to visit the clinic. Dr. Nguyen saw patients and claims were submitted for, among other things, rectal tests that were not actually performed.[8] Checks were written from Dr. Martinez's and Dr. Simmons' accounts to transfer most of the Medicare payments to the accounts of supposed "management companies" controlled by Pogosyan.[9]

The Pease clinic closed in March 2010, but Pogosyan had already opened a third clinic with Dr. Nguyen in January 2010. This time, Dr. Nguyen and Pogosyan applied for a provider number in the name of Silver Star Medical

---

[8] Of the $1,892,283 in claims the Pease clinic submitted under Dr. Martinez's provider number, $489,183 (26%) were for rectal test claims. Of the $304,272 in claims submitted under Dr. Simmons' provider number, however, only $1,281 (0.4%) were for rectal tests.

[9] The "management company" for Dr. Martinez was called Gold Star Office Manage, Inc. Gold Star was owned by Mirzakhanyan's father, but Pogosyan had apparently opened an account for it by forging his signature. The payments to Dr. Simmons were transferred to Southwest Administrative Services, Inc. From these accounts, money would again be sent to companies owned by Shakhbazyan's and Pogosyan's wives or withdrawn as cash.

No. 17-20063

Group, a professional association they had created. For the second time, Dr. Nguyen signed a Medicare enrollment application, opened a bank account, and provided the checkbook to Pogosyan.

At Silver Star, Dr. Nguyen saw patients, including some patients he had previously seen at Pease. As before, patients were paid and claims were submitted to Medicare that included rectal tests that were never performed.[10]

The scheme ended in April 2010 after the FBI executed search warrants on the Pease and Silver Star clinics. Overall, the evidence at trial showed that 39,608 claims totaling $7,638,245 had been submitted to Medicare for services from Dr. Nguyen, Dr. Martinez, and Dr. Simmons, for which it paid $3,349,851.[11]

A grand jury returned a 52-count indictment against the defendants. All four defendants were charged with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Bagoumian was also charged with conspiracy to pay kickbacks in violation of 18 U.S.C. § 371.

The indictment also charged 42 substantive counts of health care fraud. On each substantive count, the defendants were charged and convicted under both 18 U.S.C. Section 1347 and 18 U.S.C. Section 2, as principals and as aiders and abettors.[12] However, not every count applied to every defendant. Dr. Nguyen and Bagoumian were both initially charged with all 42 counts, but the government ultimately dismissed nine counts with respect to Bagoumian.[13] Dr. Martinez and Dr. Simmons were only charged with those substantive

---

[10] Of the $2,791,430 in claims submitted under the Silver Star provider number, $275,670 (10%) were for rectal tests.

[11] Rectal tests account for approximately one fourth of these amounts.

[12] "Aiding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit." *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992).

[13] The government dismissed Counts 2-6, 9-11, and 15 for Bagoumian.

## No. 17-20063

counts for claims submitted under their respective provider numbers.[14] Finally, the doctors were each charged with multiple counts of engaging in monetary transactions of property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.[15]

The defendants were convicted as charged following a nine-day jury trial. The district court sentenced them as follows:

- Bagoumian — 51 months imprisonment, 3 years of supervised release, $2,675,628.06 in restitution, $3,500.00 in special assessments;

- Dr. Nguyen — 87 months imprisonment, 3 years of supervised release, $3,357,752.62 in restitution, $4,700.00 in special assessments;

- Dr. Martinez — 28 months imprisonment, 3 years of supervised release, $1,109,203.31 in restitution, $1,600.00 in special assessments;

- Dr. Simmons — 15 months imprisonment, 3 years of supervised release, $171,833.82 in restitution, $1,200.00 in special assessments.

The defendants timely appealed.

## DISCUSSION

The defendants challenge the sufficiency of the evidence for their convictions, the jury instructions, and the exclusion of certain "reverse 404(b)" evidence. Bagoumian raises additional challenges to her sentence. We discuss the challenges in that order.

---

[14] Dr. Martinez was charged with Counts 16-28. Dr. Simmons was charged with Counts 29-37.

[15] Dr. Nguyen was charged with Counts 45-48, Dr. Martinez with Counts 49-50, and Dr. Simmons with Counts 51-52.

## I.    *Sufficiency of the Evidence*

We review the denial of a motion for judgment as a matter of law *de novo*. *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018).  To evaluate whether the evidence is sufficient to support a jury conviction, we "examine[] whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *Armstrong*, 550 F.3d at 388.  "We do not evaluate whether the jury's verdict was correct, but rather, whether the jury's decision was rational."   *United States v. Miles*, 360 F.3d 472, 477 (5th Cir. 2004).  The "verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

Though the government cannot obtain a conviction by piling "inference upon inference," the defendants cannot obtain an acquittal simply by ignoring inferences that can logically be drawn from the totality of the evidence. *Id.* at 1521, 1519.  When evaluating the sufficiency of the evidence "[n]either the jury nor this [c]ourt is obligated to examine each circumstance in isolation." *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990).

Below, we discuss each count as relevant to each defendant and review the evidence.  We begin with the count for conspiracy to violate the Anti-Kickback statute, which is unique to Bagoumian.  We then proceed to the counts for conspiracy to commit health care fraud and health care fraud, which apply to all the defendants.  Finally, we address the counts against the doctors for engaging in monetary transactions of property derived from specified unlawful activity.

No. 17-20063

## A. *18 U.S.C. § 371 — Anti-Kickback Conspiracy*

Bagoumian was convicted of conspiracy to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). That Act "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *Miles*, 360 F.3d at 479. A conspiracy requires "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013) (quoting *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009)). As to *mens rea*, a defendant must have had the "specific intent to do something the law forbids." *Id.* (citation omitted).

Bagoumian alleges the evidence does not support that she had the specific intent to do anything unlawful. The evidence from which jurors could make findings includes that 15 of the 19 patients who testified stated they were paid to visit the clinics, and 12 of them testified the *only* reason they visited the clinics was to get paid. Bagoumian lived with three of the co-conspirators who pled guilty: Mirzakhanyan, Shakhbazyan and Pogosyan. Frank "Bones" Montgomery, the marketer recruiting "patients," testified that Bagoumian paid him cash for patients directly, indirectly by placing cash behind the bathroom cabinet, and she was often present when Montgomery was paid by Pogosyan.

Bagoumian contends there was no evidence that she knew the payments were illegal or that Montgomery used the money to pay patients. To the contrary, the testimony about her use of the bathroom cabinet to place cash payments was relevant evidence Bagoumian knew of their illegality because the "unusualness of this transaction supports a reasonable inference of a

9

design to conceal." *United States v. Willey*, 57 F.3d 1374, 1387 (5th Cir. 1995). The jury could have easily credited Montgomery's testimony that, on at least one occasion, Bagoumian directed him to recruit additional patients because she was "running short."

Weighing the circumstantial evidence that she lived with the organizers of the conspiracy, that she placed cash in a bathroom to pay recruiters, and that the recruiter Montgomery admitted to being paid for each patient he procured through Bagoumian's secreted envelopes of cash, and that witnesses who had been the ostensible patients testified they were paid to go to the clinics, jurors could properly find that Bagoumian knowingly participated in the kickback conspiracy. *See Gibson*, 875 F.3d at 188-89.

### B. *18 U.S.C. § 1349 — Conspiracy to Commit Health Care Fraud*

All four defendants were convicted of conspiracy to commit health care fraud. Proof of such a conspiracy requires evidence "that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). No formality to the agreement needs to exist, and it can even be unspoken. *Id.* On the other hand, any "'similarity of conduct among various persons and the fact that they have associated with or are related to each other' is insufficient to prove an agreement." *Ganji*, 880 F.3d at 767-68 (quoting *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978)). Nonetheless, an "agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Grant*, 683 F.3d at 643 (quoting *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009)).

The evidence in this case bears a striking resemblance to the evidence we considered in a 2016 decision in which we affirmed convictions for health fraud committed by a doctor and others in Houston. *See United States v. Barson,* 845 F.3d 159 (5th Cir. 2016). While sufficiency challenges are inherently case-specific, *Barson* nonetheless provides a useful benchmark for our analysis. For that reason, we first review our reasoning in that case. We held there was "ample circumstantial evidence to establish . . . knowledge of the ongoing health care fraud" because it showed that Doctor Barson

> signed documents in blank allowing the clinic to bill under his Medicare identification number and opened a bank account in his name to receive Medicare reimbursements[,] . . . signed a number of blank checks to permit [Edgar] Shakbazyan to draw on the account[,] . . . allowed the bank statements to be sent to the clinic and never reviewed them[,] . . . received a significant sum, $7,000 per month, for reviewing patients' charts every other Saturday[,] . . . [and] admitted to an FBI investigator that despite his suspicions and bad feelings about the clinic, he reported his suspicions to no one.

*Id.* at 164.

> There also was sufficient evidence to convict the co-defendant, who

> held himself out as a "doctor" at the clinic and falsely claimed . . . that he was a physician's assistant, the clinic's on-site medical staff member[,] . . . saw almost all of the patients and turned a blind eye to the fact that most of the so-called patients had no need for medical care and that many received no medical care[,] . . . saw large numbers of patients lining up outside the clinic daily after being delivered to the clinic by the same white van[,] . . . had access to the clinic's mail including the bank statements and Medicare remittances[,] . . . was paid $20,000 for his work, a large sum for an unlicensed individual to pose as a physician's assistant[,] . . . [and] lied to investigators about the payments he received.

*Id.* at 164-65.

This present appeal, though, does present some issues absent from *Barson* that we will discuss where needed. We now review the evidence.

No. 17-20063

*1. Evidence as to Dr. Nguyen*

Since Dr. Nguyen does not dispute that many of the claims submitted to Medicare were fraudulent, he challenges only the knowledge element of his conspiracy conviction.  Like the doctor-defendant in *Barson*, Dr. Nguyen "signed documents in blank allowing the clinic to bill under his Medicare identification number[,] . . . opened a bank account in his name to receive Medicare reimbursements[,] . . . [and] signed a number of blank checks to permit" Pogosyan "to draw on the account." *Id.* at 164.

An expert, Dr. Michael Snyder, testified about the three rectal test procedures: anorectal manometry, anal electromyography, and rectal sensation tests.  Dr. Snyder indicated that these tests are relatively uncommon, and that it would be "somewhat inappropriate" for a family practice clinic to perform the tests rather than a specialist.  Dr. Snyder reviewed 277 patient files containing rectal test orders, most of which were signed by Dr. Nguyen, and testified that he concluded none were actually performed.  Hundreds of actual patient files with rectal test orders signed by Dr. Nguyen were introduced into evidence.

Like the physician-assistant defendant in *Barson*, Dr. Nguyen worked on a daily basis at the clinic, where he "saw almost all of the patients and turned a blind eye to the fact that most of the so-called patients had no need for medical care and that many received no medical care." *Id.*  Many patients Dr. Nguyen ostensibly evaluated testified at trial that they never saw a doctor.  Mirzakhanyan testified that Dr. Nguyen was only at the Jefferson clinic for approximately three hours each day, yet Dr. Nguyen supposedly "treated" up to 10-15 patients daily, and the Jefferson clinic submitted 11,276 claims to Medicare for 683 beneficiaries in just seven months, an average of 16.5 claims per patient.

12

No. 17-20063

When Dr. Nguyen actually saw patients, there was video evidence that he spent just a few minutes with them before billing Medicare for 45-minute examinations and dozens of "tests" that he had ordered. This was undisputed by Dr. Nguyen's own testimony. Some patients were treated by Dr. Nguyen at multiple clinics in a short period of time and Medicare was billed for identical procedures.

Finally, an inference of knowledge was supported by Dr. Nguyen's "proximity to the fraudulent activities" at all three clinics, which gave him a unique vantage point for observing the suspicious nature of the operation. *United States v. Willett*, 751 F.3d 335, 340 (5th Cir. 2014).

There was ample circumstantial evidence of Dr. Nguyen's knowing participation in the conspiracy.

### 2. Evidence as to Dr. Martinez

Dr. Martinez also challenges the sufficiency of the government's evidence for the knowledge element of his conspiracy conviction. Like Dr. Nguyen, Dr. Martinez signed Medicare enrollment forms, opened a bank account, and turned over control to Pogosyan.[16] He agreed to travel to Houston once per month to review patient files for a payment of $7,000 monthly. For the first three months that Dr. Martinez drew a salary, the Pease clinic did not see any patients and there were no patient files for him to review. An FBI agent testified that Dr. Martinez travelled to Houston only seven times and spent at most 20 total hours reviewing files, for which he was paid $64,575. As with Dr. Nguyen, the government introduced expert testimony and patient files that implicated Dr. Martinez in the rectal test orders.

---

[16] Dr. Martinez argues there was no evidence he signed blank checks or even opened the account. There is no dispute, though, that Dr. Martinez was *paid* out of the account, with checks that bore his name and ostensible signature. The jury was free to draw its own conclusions.

Also relevant to Dr. Martinez is that he closed his "practice" shortly after Medicare sent a letter to the Pease clinic notifying him that all claims submitted under his provider number would be subject to "prepayment review" and require documentation before payment would be remitted.  In *Barson*, we found it to be relevant evidence that the doctor-defendant closed the bank account one week after a Medicare investigator tried unsuccessfully to contact him by phone. *Barson*, 845 F.3d at 163.  The Medicare prepayment letter here was dated March 2, 2010.  The search of the Pease clinic recovered a letter on Dr. Martinez's letterhead notifying patients that he was closing his practice, effective March 31, 2010.

The jury could have determined that Dr. Martinez closed the clinic in response to the prepayment letter out of concern that the additional scrutiny would lead to the discovery of the conspiracy.  Such "efforts to assist in the concealment of a conspiracy may help support an inference that an alleged conspirator had joined the conspiracy while it was still in operation." *United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. Unit A 1981).

Dr. Martinez insists there is no evidence he received the prepayment letter, and that his wife's testimony showed he closed the clinic because she had returned to work.  The jury, though, was free to disbelieve his wife's testimony, particularly since Martinez had the opportunity to see the prepayment letter when he traveled to Houston on March 29.

Dr. Martinez also emphasizes there was no evidence he reviewed any of the rectal test orders related to the false claims charged in the substantive counts.  This takes too narrow a view of the evidence because "where a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof." *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999).  In addition to the patient files for the substantive counts, the government introduced dozens of additional patient files containing

No. 17-20063

orders and results for rectal tests initialed by Dr. Martinez.  For example, one file contained orders signed by Dr. Martinez for an anal EMG and an anorectal manometry on six dates from January 13 to 30 of 2010.  The earliest date Dr. Martinez could have seen this file was January 26, when there had already been ten rectal tests "ordered" for the same patient in just two weeks.

We conclude that here too, there was sufficient circumstantial evidence of Dr. Martinez's knowledge of the conspiracy.

### 3. Evidence as to Dr. Simmons

The evidence supporting Dr. Simmons' conspiracy conviction follows along the same lines.  Dr. Simmons signed Medicare enrollment forms, opened a bank account, and turned over blank checks to Pogosyan.  Dr. Simmons was paid a salary of $8,000 per month for a total of $40,000, but he told the FBI that he only went to Houston twice and spent at most two hours reviewing files each time.

Dr. Simmons also closed the bank account he had opened two days after a search warrant was executed on the Pease clinic.  As with Dr. Martinez's actions shortly after the prepayment letter, the jury could have viewed this as evidence of knowledge.  A possible distinction between Dr. Simmons' conduct and that of Dr. Martinez is the absence of evidence that Dr. Simmons was aware of the search warrant, and that even if he were, there is nothing inherently suspicious about closing the account in response.  An FBI agent who testified for the government at trial seemingly supported that closing this account would not be an effective means of concealing illegal activity.

Even if closing the account was the "smart thing" for an innocent person who was "unwitting[ly] . . . working in a 'climate of activity that reeks of something foul,' as he purports to have been, he presumably would have no reason to lie" to the FBI about it.  *United States v. Fuchs*, 467 F.3d 889, 909

15

(5th Cir. 2006). Dr. Simmons told the FBI he closed the account because he was told the clinic "no longer had a physician there." He also told the FBI in his initial interview that he traveled to Houston to review files on three occasions, only later to admit he only went twice. The jury was entitled to consider not only the account closure itself, but also Dr. Simmons' statements surrounding the account closure. "Both inconsistent statements and implausible explanations have been recognized as evidence of guilty knowledge." *United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003).

It is true that Dr. Simmons' provider number was only used to submit claims for a handful of rectal tests,[17] and the order forms for those tests do not contain his signature. Nonetheless, his signature does appear on at least five orders for rectal tests that were not submitted to Medicare.

Whether a claim was actually submitted to Medicare for these tests is irrelevant, as it is "settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy" and "a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit." *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999).

Dr. Simmons told the FBI that he never saw rectal tests in the files he reviewed, and that he "never challenged a chart" because he never saw anything "significantly abnormal." In his view, once we set the rectal tests aside, the remaining tests "are not simple, commonly-known procedures . . . such as taking one's temperature . . . that a jury could be expected to understand without explanation."

---

[17] Of the $304,272 in claims submitted under Dr. Simmons' provider number, only $1,281 (0.4%) were for rectal tests.

We look at some of the evidence to see if this argument holds up. The physical examination approved by Dr. Simmons for patient S.F. reported a temperature of 94.6 degrees but listed her general condition as "healthy." Patient O.O. reported suffering from chills, which makes sense given that his temperature was similarly recorded as 94.8 degrees in the physical examination signed by Dr. Simmons. Dr. Simmons also signed off on a chart that ordered, among other things, an allergy test for a patient that reported a 93.7 degree temperature. In fact, only *one* of the 21 patient files signed by Dr. Simmons recorded a temperature above 98 degrees. The jury did not require any medical training to disagree with Dr. Simmons and find that "significantly abnormal" temperatures were recorded in the patients' charts.

There was sufficient circumstantial evidence of Dr. Simmons' knowledge that he was participating in a conspiracy to commit health care fraud.

### *4. Evidence as to Bagoumian*

Bagoumian's conviction on the health care fraud conspiracy does not inevitably follow from her conviction on the Anti-Kickback Statute conspiracy. This is because "[i]llegal remuneration does not require fraud or falsity" whereas "[h]ealth care fraud . . . requires fraud or falsity but does not require payment in return for a referral." *United States v. Ogba*, 526 F.3d 214, 234 (5th Cir. 2008).

Evidence of the kickback scheme is relevant to the conspiracy to commit health care fraud because paying patients is clearly a possible indicator of health care fraud. *See United States v. Sanjar*, 876 F.3d 725, 745-46 (5th Cir. 2017). Here, though, there was also substantial other evidence against Bagoumian. Like Dr. Nguyen, Bagoumian's "proximity to the fraudulent activities" at all three clinics helps support an inference of knowledge. *Willett*, 751 F.3d at 340.

No. 17-20063

Especially inculpatory of Bagoumian was the video that showed her acting as an unlicensed medical technician and apparently "performing" a fraudulent rectal test procedure.  The video was surreptitiously recorded by a patient cooperating with investigators, and it showed Bagoumian placing a device on a patient's buttocks without inserting it as required for the use of the device.  The government's expert was somewhat baffled by the scene depicted in this video.

Bagoumian's only response to this video on appeal is that she "was just a worker . . . who did not make big decisions and did as told."  This assertion is not even exculpatory.  The evidence was sufficient for the jury to conclude she knowingly entered into a conspiracy to commit health care fraud.

### C. 18 U.S.C. § 1347 — Health Care Fraud (Counts 2-43)

"To prove health care fraud in violation of 18 U.S.C. § 1347(a), the Government was required to show that [the defendants] either (1) knowingly and willfully executed, or attempted to execute, a scheme or artifice to defraud a health care benefit program, or (2) knowingly and willfully executed, or attempted to execute, a scheme or artifice to obtain, by means of false or fraudulent pretenses, money under the control of a health care benefit program." *United States v. Mahmood*, 820 F.3d 177, 185-86 (5th Cir. 2016).

It is enough for criminal liability if a defendant "associates with the criminal activity, participates in it, and acts to help it succeed." *United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir.1997) (citation omitted). Nonetheless, the "Government must first 'prove that someone committed the underlying substantive offense.'" *United States v. Rufai*, 732 F.3d 1175, 1190 (10th Cir. 2013) (quoting *United States v. Self*, 2 F.3d 1071, 1088-89 (10th Cir. 1993)).  Otherwise "there was no crime . . . to have abetted." *Armstrong*, 550 F.3d at 394.

18

Such proof is also a prerequisite to the application of the principle that "a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable *and* committed in furtherance of the conspiracy." *United States v. Armstrong*, 619 F.3d 380, 387 (5th Cir. 2010) (quoting *United States v. Gonzalez*, 570 F.3d 16, 26 n.8 (1st Cir. 2009)).

In other words, each substantive count requires the government prove the submission or attempted submission of a separate fraudulent claim, since "the health care fraud statute, § 1347, punishes executions or attempted executions of schemes to defraud, and not simply acts in furtherance of the scheme." *United States v. Hickman*, 331 F.3d 439, 446 (5th Cir. 2003). The proof of actual fraud is as follows.

Each of the 42 substantive counts in the indictment "was based on a separate request for Medicare reimbursements that . . . were not for medical services needed or provided." *Barson*, 845 F.3d at 165. If there is no dispute that a co-conspirator "actually submitted or caused to be submitted the fraudulent claim forms for Medicare reimbursement," then "the jury was entitled to convict them on the substantive counts as well." *Id.* at 165. Since we have concluded there was sufficient evidence for the conspiracy convictions, there was also sufficient evidence of knowledge for the substantive counts. *Id.*

The defendants, though, also argue that for the substantive counts based on non-rectal test claims, there was insufficient evidence the services were either not provided or not medically necessary. That would mean there was no crime to which liability could attach. The defendants focus on the absence of patient and expert testimony relevant to some of the specific substantive counts. For 19 counts, the claims at issue did not include rectal tests, and therefore no expert testimony was presented about the billed procedures. For 10 of these counts, the evidence included both the patient file and the patient's testimony. Four of the counts were supported by patient testimony but not a

patient file.  For the remaining five counts, there was a patient file but no patient testimony.

The government responds that there was sufficient evidence from which "the jury could reasonably infer that all the claims were fraudulent."  The government urges "an inference of fraud across the board" because the claims were (1) "based on falsified Medicare applications, which failed to disclose who was really running the clinics" or Dr. Nguyen's role at the Pease clinic, (2) the claims were submitted by clinics where recruiters of patients were clearly used, and (3) the clinics engaged in a pattern of ordering the "same sets of tests for . . . many patients."  Across-the-board inferences, though, must not undermine the obligation that we ensure "individual consideration of every count in an indictment by the jury." *Armstrong*, 550 F.3d at 394 (quoting *United States v. Cuong*, 18 F.3d 1132, 1142 (4th Cir. 1994)).

In one case, we held that each claim to an insurer represented a separate "execution" for purposes of Section 1347 because the defendants "submitted each claim separately" and "each claim was individually considered and approved" by Medicare and others.  *Hickman*, 331 F.3d at 446-47.  Separate claims constitute separate executions precisely "because they [are] 'chronologically and substantively independent, none depend[s] on the others for its existence, and each ha[s] its own functions and purpose.'" *United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir. 1994) (brackets omitted) (quoting *United States v. Molinaro*, 11 F.3d 853, 860 (9th Cir. 1993)).

This need for individual consideration of substantive counts is especially the case here, as neither the indictment nor the jury instructions contemplated a fraud premised on omissions in the enrollment forms.  A government witness also testified that if test results were in a patient file, then a claim for the test was only fraudulent if it was not medically necessary.  "[T]he definition of an execution is inextricably intertwined with the way the fraudulent scheme is

defined." *Hickman*, 331 F.3d at 446. Here, it was defined to be the submission of claims for services not performed or not medically necessary.

While evidence of a pattern may certainly be relevant, it should not be mistaken for a rebuttable presumption that each count was fraudulent. The government argues that it has evidence for each count not based on rectal test claims: either dispositive patient testimony or a patient file identifying a "chief complaint[] of orthopedic pain" that did not align with the submitted claims,[18] or both.

The patient files contain some but limited evidence. There is a form for a physical examination that identified a "chief complaint" that was most often back pain. The files also included a form for patients to check off their symptoms and presumably provide a medical basis for testing.[19] The mismatch between the chief complaints and the treatments allegedly provided are part of a pattern supporting fraud. The mismatches are insufficient by themselves, as what a patient identifies as the medical problem might not be what a doctor later determines to be the causes that need treatment.

To be clear, this circuit has avoided imposing strict evidentiary requirements for proving health care fraud. It is not necessary to present live-witness testimony from the patients for whom the fraudulent claims were submitted. *See United States v. Mekjian*, 505 F.2d 1320, 1329 (5th Cir. 1975).

---

[18] This reflects a pattern in the patient files identified at trial by Special Agent Caddel, who testified that "out of the 1229 files [he] reviewed, 730 of the chief complaints were for back pain."

[19] For example, the file for patient C.G. listed her "chief complaint" as "generalized pain." C.G. testified to checking on one of the intake forms symptoms that included: chest pain, high blood pressure, irregular heartbeat, swelling of ankles, bronchitis, abdominal pain, urine leakage, arthritis, muscle pain, back pain, numbness, tingling, and muscle weakness. C.G. even testified to actually suffering from the symptoms. Count 25, the sole count of the indictment related to C.G., concerned a claim for services related to an abdominal ultrasound, a urea breath test, echocardiography, duplex scans of the lower extremity arteries and veins, and "bronchodilation responsiveness."

No. 17-20063

We have also held there is no "basis for a categorical rule that expert testimony is required for a jury finding of medical necessity." *Sanjar*, 876 F.3d at 745. There, the supposed medical conditions were "common ailments suffered and understood by millions" and therefore the "patients' perceptions of their conditions, along with the other strong indicia of fraud involving failure to evaluate patients, paying patients, and falsifying medical charts" supported the guilty verdict. *Id.* at 745-46.

We have also affirmed convictions without either type of evidence. Cases that do not require patient or expert testimony typically involve a close inference, such as treating "patients on specific dates and at specific times on which [the doctor] could not possibly have rendered services." *United States v. Akpan*, 407 F.3d 360, 365 (5th Cir. 2005). For example, no expert testimony was needed in a case in which the defendant was charged with billing for motorized wheelchairs but instead delivered less expensive motorized scooters. *United States v. Ekanem*, 555 F.3d 172, 174-75 (5th Cir. 2009). In that case, we held that jurors could infer that the defendant did not provide the motorized wheelchair that was billed from the evidence that a scooter was delivered but not billed to Medicare. *Id.*

We recently addressed the issue of medical necessity evidence in a sufficiency challenge to convictions for distributing a controlled substance. *United States v. Evans,* 892 F.3d 692, 703 (5th Cir. 2018). Our review of the "main evidence on the three convictions — the three patient files themselves — le[d] us to conclude that the jury could rationally find that [the three] prescriptions were written without a legitimate medical purpose and outside the usual course of professional practice," as they all had "the troubling features [the expert] isolated as symptomatic of illegitimate prescribing practices." *Id.*

22

In *Evans*, the defendant relied on a Fourth Circuit decision to argue that the government was required to present either patient or expert testimony specific to the prescriptions that were the basis for the charges. *Id.* (citing *Cuong,* 18 F.3d at 1132). We explained that, while not endorsing it, we had interpreted that court's reasoning "as focusing on the evidence's connection to the particular patient, not the precise type of evidence." *Id.* at 705. The government had met even this standard since it had introduced the relevant files, they were reviewed by the expert, and the expert testified that all the files he reviewed contained inadequate documentation. *Id.* at 705.

Our cases leave a simple but significant rule: so long as the jury was not forced to rely on disconnected generalizations to conclude tests were not medically necessary, and instead had some evidence to support the impropriety of each claim, there will be sufficient evidence for the convictions.

Applying these principles to the substantive counts in this indictment, we start with the 23 counts involving rectal tests. Dr. Nguyen himself indicated at trial that *all* the rectal test claims were fraudulent, testifying that he would *never* order such tests because there was "no reason to do that," that he "didn't know that [the clinics had] that equipment in the office," and that the various tests were "not normally done in the primary care physician office."

For 17 of these counts, there was also patient testimony that the rectal tests were never performed.[20] For three of the remaining counts, the relevant patient file was part of the review by Dr. Snyder, the government's expert witness, who testified that the files were "very concerning" due to improper documentation, inappropriate methodologies, and results that were "not . . .

---

[20] For two of the counts based on claims for the same patient, the testimony was provided by the patient's wife, who was herself a patient of the clinic. The fact this testimony was not from the patient himself did not render it insufficiently particular to support a conviction. *See Akpan*, 407 F.3d at 371 (5th Cir. 2005).

physiologically possible," which led him "to the conclusion that the test wasn't ever done."

Left are three counts based on rectal test claims from Pease and Silver Star for a single patient and for which there was neither patient testimony nor were the associated patient files reviewed by Dr. Snyder. This hardly matters, though, given that (1) these counts were based on claims submitted to Medicare for rectal tests, and (2) the previously mentioned testimony by Dr. Nguyen indicating that all the rectal test claims were necessarily fraudulent.

Finally, while Dr. Snyder may not have reviewed the two patient files associated with these three counts, both files were admitted at trial. Jurors could have reviewed them and reasonably inferred they each had the "troubling features [the government's expert] isolated as symptomatic of illegitimate" testing. *Evans,* 892 F.3d at 703. The files showed that over the span of just three months, the two clinics "ordered" one dozen rectal tests — six anal EMG and six anorectal manometry procedures — often just days apart and always with multiple procedures in a single day. The jury could also have concluded that the results for these tests were physiologically impossible because the rectal pressures were far below the minimum threshold (20 mmHg) described by Dr. Snyder.

We now summarize the evidence regarding the 19 counts involving claims for procedures other than rectal exams. The patients for four counts all testified that they did not see a doctor. The patient for two other counts testified that she did not see a doctor, and that she had not even been to the clinics for which the claims were submitted.

Conviction on other counts was supported by such evidence as patients' testimony that they did not have the symptoms for which tests were conducted, or that claims seeking payment for lengthy physician examinations were spurious because the patients testified that a defendant doctor spent a

dramatically shorter time.  One patient testified that she did not actually suffer from any of the symptoms she checked on the intake form, which the jury could have further relied on to find any services were not medically necessary.

For those counts growing out of claims submitted from the Jefferson clinic, there were no patient files because they had been destroyed. Nonetheless, patients on those counts were among those that testified they had no medical symptoms or did not see a doctor.  Further, the destruction of the patient files "reflects flight and concealment, both of which are evidence of the consciousness of guilt and therefore evidence of guilt itself."  *United States v. Sutherland*, 463 F.2d 641, 646 (5th Cir. 1972).  Even though spoliation "alone is insufficient to support a guilty verdict, it is relevant and admissible, and the jury could take into account" the destruction of the files in determining whether claims for those patients were fraudulent.  *United States v. Lopez*, 979 F.2d 1024, 1030 (5th Cir. 1992).

There were a few counts based on claims for one patient who testified she actually saw a doctor, that the doctor "asked . . . questions" and "listened . . . like a normal doctor"; that she took a "breathing test"; and that "they put some kind of thing . . . rubbed on [her] leg or stuck it on [her] leg." Even that patient testified she did not suffer from the symptoms documented in her file, and that the tests in the claims for that count were never performed. The jury did not require expert testimony to conclude that claims for a "urea breath test," "bronchodilation responsiveness, spirometry," and "nerve conduction, amplitude and latency/velocity studies" were not medically necessary for a patient suffering from muscle pain, a "common ailment[] suffered and understood by millions."  *Sanjar*, 876 F.3d at 746.

We now review five remaining counts for which the primary evidence was the patient file.  Those files generally included "test results" for all the

procedures in the claims. The patients for four of those counts did not testify, while the fifth did but testified she was not paid kickbacks. That fifth patient suffered from genuine health problems, and she likely filled out the symptoms form. She also testified she "saw someone, but [did not] know who he was," and that she generally had no memory of the relevant events.

For these counts, then, the government relies primarily on the disconnect between the services billed to Medicare and the "chief complaint" of back pain listed in the physical examination form as its evidence that the tests were not medically necessary. The physical examination forms for all five patient files identified a chief complaint of back pain, but they also categorized the patients' general condition as "healthy." This is even harder than back pain to square with the aggressive and exotic "testing" that ensued. On the dates of service for these claims, the clinic ordered from 9 to 17 different tests for ostensibly healthy patients reporting a chief complaint of orthopedic pain.

For all the substantive counts, the government provided sufficient evidence for jurors to conclude that fraud had in fact been committed.

### D. 18 U.S.C. § 1957 — Monetary Transactions (Counts 45-52)

For the convictions for engaging in monetary transactions in property derived from specified unlawful activity, the government must have proven three elements: "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *Fuchs*, 467 F.3d at 907. The specified unlawful activity identified in the indictment was health care fraud in violation of 18 U.S.C. § 1347.

These convictions largely turn on the same considerations as the convictions for health care fraud. Dr. Simmons and Dr. Nguyen raise no

additional issues with respect to these convictions. Dr. Martinez did brief additional arguments specific to his convictions on Counts 49 and 50. He first insists that because there was insufficient evidence to prove the non-rectal claims were either not provided or not medically necessary, the government was required to prove that that transactions involved money derived from the claims for rectal tests, as opposed to non-rectal claims. Dr. Martinez essentially argues that the insufficiency of the evidence for non-rectal claims creates a commingling problem that required the government to show that the withdrawals exceeded the amount of "clean" funds available. *See, e.g.*, *Evans*, 892 F.3d at 708-09.

This argument fails since we have already held the evidence sufficient for the jury to find that the non-rectal test claims were also fraudulent. The "clean-funds-out-first rule" is simply not applicable because the account was used exclusively for Medicare payments. The jury could conclude there were no "legitimate" deposits to exclude. Even if it was limited to rectal test claims, the government was permitted to "show aggregate withdrawals in excess of $10,000 above the amount of clean funds in the account to validate [the] money-laundering conviction[s]." *Evans*, 892 F.3d at 709. The evidence here established that $287,099.16 was deposited as payment for rectal test claims, which was fourteen times the amount necessary under the aggregation rule.

Dr. Martinez also argues there was insufficient evidence that it was he, as opposed to someone else, who moved the money from his Medicare account to the account controlled by Pogosyan because the signatures on the two checks identified in the indictment were "so different as to raise a reasonable doubt as to who participated in these financial transactions by signing those checks." A jury, though, is "entitled to draw its own conclusion as to the genuineness of signatures by making a comparison with an authentic signature." *United States v. Ismoila,* 100 F.3d 380, 388 (5th Cir. 1996). The jury was free to

compare the signatures to the "salary" checks he wrote and deposited for himself, as well as to the signature on the enrollment form.

The evidence on the counts involving monetary transactions was sufficient.

## II.    *Jury Instructions*

Defendants argue that instructions given on circumstantial evidence and the refusal to instruct on good faith require reversal.  For preserved errors, we review "jury instructions under an abuse of discretion standard and ask whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Kay*, 513 F.3d 432, 446 (5th Cir. 2007) (internal quotation marks and citation omitted).

### A. *Deliberate Ignorance*

All the defendants take issue with the district court's specially-crafted instruction on deliberate ignorance.   At the charging conference, the government requested this pattern instruction on that subject:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 1.37A (2015).

A deliberate ignorance instruction may be given "when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *Barson*, 845 F.3d at 166 (quoting *United States v. Vasquez*, 677 F.3d 685, 696 (5th Cir. 2012)).  The required evidentiary basis for the instruction is: "(1) the defendant was subjectively aware of a high

probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *United States v. Delgado*, 668 F.3d 219, 227 (5th Cir. 2012) (quoting *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). Fraud and conspiracy cases are particularly suitable for the instruction. *Gibson*, 875 F.3d at 197. Often, as here, the question is whether defendants "turned a blind eye to the fact that Medicare was being billed large sums for services not performed." *Barson*, 845 F.3d at 165-66.

The district court would not have abused its discretion by giving our pattern instruction on deliberate ignorance. The district court charted a different course. Instead of granting the government's request, the district court gave this instruction that is written in terms of circumstantial evidence:

> The defendants must be found to have acted knowingly and willfully. "Knowingly" means that an act was done intentionally and not because of mistake, accident, or another innocent reason. "Willfully" means an act was done with a conscious purpose to violate the law.
>
> . . . .
>
> Circumstantial facts tend to be the only kind available for subjective facts, something about which the jury lacks direct access to the defendant's mind. For instance, the jury may infer knowledge and intent from conduct or context.
>
> Attempts to eliminate or minimize evidence of knowledge may justify an inference of it. Knowledge does not require certainty. The law permits inferred, expected judgments to count as knowledge. These inferences must be beyond a reasonable doubt.

The doctors treat this as a flawed deliberate ignorance instruction that allowed the jury to infer knowledge based on a defendant's negligence. Bagoumian makes a similar argument and characterizes the instruction as a legally incorrect statement of the knowledge element that "essentially directed

guilty verdicts" against the defendants or "cause[d] the jury to use a lower negligence standard."[21]  Bagoumian also argues that if it was a deliberate ignorance instruction, it was improperly given as to her because there was no evidence of her "purposeful avoidance."   The defendants preserved their objections to this instruction.[22]

Bagoumian's assertion that there was no evidence of her purposeful contrivance is unconvincing.  "The sheer intensity and repetition in the pattern of suspicious activity coupled with the . . . consistent failure to conduct further inquiry create[d] a reasonable inference of purposeful contrivance."  *United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007).  Indeed, a "repeated failure to inquire is sufficient basis for an inference that they suspected or actually knew, but avoided further knowledge" of the criminal activity involved.  *Id.*

Thus there was evidence as to all four defendants to support the standard deliberate ignorance instruction.   The district court explained well its reason for deviating.  The inspiration was a dissent by Justice Anthony Kennedy that rejected the application of the willful blindness doctrine in a patent case.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 774 (2011) (Kennedy, J., dissenting).  This passage generated the instruction:

> Facts that support willful blindness are often probative of actual knowledge. Circumstantial facts like these tend to be the only available evidence in any event, for the jury lacks direct access

---

[21] As we stated already, the standard of review for a preserved challenge to a jury instruction is abuse of discretion.  Bagoumian contends that she is entitled to *de novo* review because a statutory element of the crime is involved.  "Although we typically review jury instructions for abuse of discretion, when the objection is based on statutory interpretation, review is *de novo*." *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016).  This challenge, though, is not to an instruction on the elements of the crime.  The thrust of Bagoumian's argument is the same as the doctors' challenge: the instruction lowered the burden of proof for the knowledge element.

[22] The district court ruled at the beginning of trial that an objection by counsel for one defendant would "apply to all" of them.  At the charge conference, Dr. Martinez objected to it as a deliberate ignorance instruction and Dr. Nguyen objected that it "lessen[ed] the government's burden of proof."

to the defendant's mind.  The jury must often infer knowledge from conduct, and attempts to eliminate evidence of knowledge may justify such inference, as where an accused inducer avoids further confirming what he already believes with good reason to be true. The majority's decision to expand the statute's scope appears to depend on the unstated premise that knowledge requires certainty, but the law often permits probabilistic judgments to count as knowledge.

*Id.*  The word "expected" was substituted in the instruction given at this trial for Justice Kennedy's word "probabilistic," which means "based on probabilities."  OXFORD ENGLISH DICTIONARY (OED) (3d ed. 2007).

Walking through the instruction, we see that it starts with the requirement that the defendants have acted knowingly.  It then observes that circumstances generally will be the only evidence of a defendant's state of mind.  Jurors are allowed to "infer knowledge and intent from conduct or context," *i.e.,* jurors can use circumstantial evidence.

The final part of the instruction focuses jurors on the task at hand.  A defendant's efforts "to eliminate or minimize evidence of knowledge may justify an inference of it."  Here, as in the earlier use of "infer," it is the jurors who are the ones who may be justified in making an inference of knowledge.  The next sentence explains that when jurors are deciding whether to infer that a defendant knew of the fraud, they are not required to find the person was certain of the fraud.  Reading minds is difficult enough, but jurors did not have to find that a defendant was without any doubt about the criminal nature of the enterprise, only that he or she had a level of knowledge that replaced mistake, accident or other innocent reasons.

The next sentence is the most difficult in the instruction: "The law permits inferred, expected judgments to count as knowledge."  Justice Kennedy has used the word "probabilistic," but the charge conference led to the use of the word "expected."  One definition of the substituted word is "[a]nticipated,

regarded as probable or likely; predicted." OED (3d ed. 2015). We believe the most natural interpretation of this sentence is that if the circumstances of the actions of a defendant caused jurors to expect or infer that he or she would have known of the fraudulent nature of the clinic's work, that satisfies the requirement to find that a defendant acted knowingly. The instruction closed with the provision that such "inferences must be beyond a reasonable doubt."

We must start with the observation that this is a difficult instruction to understand. It would have been better left as a conceptual and unsubmitted disagreement with the pattern deliberate ignorance instruction. The concern is whether the instruction lowered the standard of proof as to knowledge. Error will exist if the instruction can reasonably be read to mean that if people would be expected to infer something, the defendant is guilty even if he or she negligently failed to make the inference.

We do not see such a reading by jurors as a likely one. We say that because, in summary, the instruction informed jurors they would be justified in finding a defendant knew of the fraud if he or she took steps "to eliminate or minimize evidence of knowledge." The "knowledge" that needed to exist did "not require certainty," which reasonably would mean that a defendant who attempted to avoid creating evidence of knowledge did not need to be absolutely certain of the fraud to be criminally knowledgeable. Jurors were also told in this context that they could not rely on "mistake, accident, or another innocent reason" to support guilt. The challenged language about expectations and inferences was followed immediately by requiring the inferences to "be beyond a reasonable doubt."

Less than sparkling clarity or a problematic phrase does not invalidate an instruction and certainly does not necessarily create reversible error. An instruction is examined in the context of the universe of guidance. *Dupuy v. Cain*, 201 F.3d 582, 587 (5th Cir. 2000). Though we see no clear lowering of

the standard of proof as to knowledge, we do see the possibility of confusion. Potentially creating more uncertainty for jurors, the district court recited the reasonable doubt standard in its preliminary instructions and general instructions, but in the special instructions it recited the reasonable doubt standard for every count *except* the health care fraud conspiracy.

For these reasons, uncertainty persists about whether jurors would have understood from this instruction in isolation that they must find beyond a reasonable doubt that each defendant actually knew about the fraud based on evidence of a defendant's attempts to avoid learning of it. They were not instructed on deliberate ignorance of the fraud. We conclude that it was error to give this instruction, not because it gave a lower standard of proof to jurors but because it gave such a muddled standard.

Whether we can review potential confusion arising from an instruction for harmless error depends on whether the defect constitutes a "structural error," which is "limited to a narrow class of cases that 'infect the entire trial process,' necessarily rendering 'a trial fundamentally unfair.'" *United States v. Stanford*, 823 F.3d 814, 830 (5th Cir. 2016) (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999)). We divide instruction errors on the standard of proof into those stating no standard, which can be reviewed for harmlessness, and those that state an incorrect standard — which cannot. *Id.* at 831. The error here was the creation of a potential for confusion. That form of error is essentially an omission of an intelligible standard of proof in a discrete part of the instructions while the correct standard was stated elsewhere. We conclude that our review is properly for harmlessness.

Error in an instruction will be considered harmless if the court, "after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *United States v. Cessa*, 785 F.3d 165, 186 (5th Cir. 2015) (quotation marks omitted)

(quoting *United States v. Skilling*, 638 F.3d 480, 482 (5th Cir. 2011)).  Here, a finding of knowledge beyond a reasonable doubt was inherent in the jury's verdict given the special instruction that required it to find a defendant "willfully became a member" of the conspiracy.  *See Stanford*, 823 F.3d at 830-34.  The district court's general instructions recited the reasonable doubt standard and defined willfully as a requirement that means "an act was done with a conscious purpose to violate the law."  Regardless of some opaqueness in the challenged instruction, we do see as clear that jurors still knew they must decide beyond a reasonable doubt if a defendant would have reached the judgment that the enterprise was criminal.

We conclude that a more clearly instructed jury would have reached the same verdict as did this one.   The error was harmless.

### B. *Good Faith*

The doctor defendants also argue that the district court abused its discretion by denying their request for a good faith instruction, and that this compounded the harm of the improper instruction on deliberate ignorance.  "Failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury."  *Sanjar*, 876 F.3d at 742.

Both conditions are satisfied here.  The district court instructed the jury that the defendants must have acted "with a conscious purpose to violate the law," and all the defendants argued good faith in their closings.

### III.    *Reverse 404(b) Evidence*

The defendants argue that the district court erred in excluding evidence that Pogosyan and Shakbazyan, two of the conspirators who pled guilty before trial, were previously indicted in Arizona for a similar Medicare fraud scheme, and that the investigators there had viewed those doctors as unwitting dupes

rather than co-conspirators.  The Arizona charges were dismissed.  The doctors sought testimony from the associated doctor and an investigator in the case. The district court concluded that even if the Arizona doctor was tricked, "[p]roving there are other people who didn't know the speed limit sign was there doesn't prove you didn't know."

A trial judge's evidentiary rulings are reviewed "for abuse of discretion, subject to harmless error review."  *United States v. Alaniz*, 726 F.3d 586, 606 (5th Cir. 2013) (quoting *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011)).  The trial court has broad discretion in determining the relevance or prejudicial effect of evidence.  *Id.*

Whatever the probative value, the sought-after evidence here was convoluted.  The defendants sought to call non-party witnesses to testify to a lack of knowledge, of a different scheme, in a different state, that was operated by two of the same individuals as this scheme, to support an inference that the more recent defendants had a lack of knowledge of this scheme.

Since Shakhbazyan and Pogosyan pled guilty, the defendants could have simply called them to testify about the defendants' *actual* level of involvement in the *actual* scheme at issue in their trial.  Dr. Martinez and Dr. Simmons ask us to take judicial notice of Pogosyan's statements when he pled guilty two months before trial.

> DEFENDANT POGOSYAN: Doctor – excuse me.  Dr. Benjamin Martinez and Donovan Simmons, they didn't actually know anything about the whole – what do you call it, conspiracy. They were –
>
> THE COURT: You didn't tell them, is that what you're telling me?
>
> DEFENDANT POGOSYAN: Yes. Yes, Your Honor.
>
> THE COURT: So you don't know what they knew.  You just know what you – you didn't have any contact with them in which you disclosed –

No. 17-20063

DEFENDANT POGOSYAN: Yes, Your Honor.

THE COURT: – what was going on?  Did you have any contact with them?

DEFENDANT POGOSYAN: No, Your Honor.

THE COURT: Okay.  And so all you can testify to, technically, is that you are not aware of whether they knew anything about it.  Is that what you're telling me?

DEFENDANT POGOSYAN: Yes, Your Honor.

We see no reason for judicial notice.  There is no claim here that Pogosyan was prevented by the court from testifying.  Both principals in the conspiracy were subpoenaed to appear at trial but neither was called to testify.  In their brief, the doctors claim that Pogosyan invoked his Fifth Amendment right, but at sentencing counsel admitted to the district court that "[t]here was a tactical decision made by counsel not to call them."

The district court did not abuse its discretion by excluding attenuated and collateral evidence of the Arizona scheme.

## IV.   *Bagoumian Sentencing Challenges*

Bagoumian's Guidelines range was 51 to 63 months.  The district court sentenced her at the low end of the Guidelines range at 51 months.  She nonetheless argues that the district court (A) prejudicially relied on her national origin, (B) erred in refusing to grant a downward adjustment, and (C) imposed a substantively unreasonable sentence.

### A. National Origin

Bagoumian first argues that her sentence must be vacated and remanded because the district court improperly relied on her Armenian national origin at sentencing.  *See United States v. Winters*, 174 F.3d 478, 482 (5th Cir. 1999).  At sentencing, the district court asked Bagoumian, "Ma'am, are you related to anybody else in this case?  There are so many people, I

forgot." To be clear, the issue here is based solely on this question. Yes, some of the other defendants were Armenian. Inquiring about her relationship to her co-defendants, in a case where some of the conspirators' family members were involved,[23] does not support an argument that the district court relied upon her national origin in sentencing.

### B. Mitigating Role Adjustment

In her sentencing memorandum, Bagoumian requested a two-level minor role adjustment under U.S.S.G. § 3B1.2. A minor participant is one who "is less culpable than most other participants . . . but whose role could not be described as minimal." § 3B1.2 cmt. n.5. Based on a totality of circumstances, courts consider "the degree to which the defendant understood the scope . . . of the criminal activity," the defendant's participation in planning, the defendant's exercise of decision-making authority, "the nature and extent of the defendant's participation," and "the degree . . . the defendant stood to benefit." § 3B1.2 cmt. n.3(c). How the court weighs the factors is a matter of discretion. *United States v. Torres-Hernandez*, 843 F.3d 203, 210 (5th Cir. 2016). Whether a defendant was a minor participant is "a factual determination that we review for clear error." *Id.* at 207 (quoting *United States v. Gomez-Valle*, 828 F.3d 324, 327 (5th Cir. 2016)).

Bagoumian argued that her actions were comparable to other office workers who were not indicted. Among her reasons is that she had no role in the billing process and was only paid a salary. The district court implicitly overruled her request, noting that she was "frequently the on-site manager" at the clinic who had conducted phony medical tests. She "knew how many people were coming through" the clinics, "knew the operation was running off of tests

---

[23] For example, Pogosyan and Shakhbazyan transferred most of the money to companies owned or controlled by their wives.

not performed," and "was an essential element in the structure of the conspiracy." Bagoumian fails to identify any error in these reasons for the district court's determination.

### C. Substantive Reasonableness

Bagoumian also argues her sentence is substantively unreasonable. Her within-Guidelines sentence is presumptively reasonable and rebuttable "only if the appellant demonstrates that the sentence does not account for a [18 U.S.C. § 3553(a)] factor that should receive significant weight, gives significant weight to an irrelevant or improper factor, or represents a clear error of judgment in balancing the sentencing factors." *United States v. Hernandez*, 876 F.3d 161, 166 (5th Cir. 2017). "We review an appellant's claim that her sentence [was] substantively unreasonable for abuse of discretion." *Id.*

Bagoumian argues that the district court "overreli[ed] on the loss amount" because Section 2B1.1(b)(1) of the Sentencing Guidelines resulted in "excessive and disproportionate" increases to her offense level. Bagoumian does not suggest the district court improperly calculated the loss amount or misapplied Section 2B1.1(b)(1), but rather seems to be suggesting that the district court's correct application Section 2B1.1(b)(1) resulted in a Guidelines range that overstated the seriousness of the offense. While Bagoumian cites to some out-of-circuit cases discussing Section 2B1.1(b)(1) and the potential for large increases to an offense level, she fails to provide any argument or authority as to how the district court's consideration of the Guidelines range here constituted an erroneous "overreliance on the loss amount" under the Section 3553(a) factors. She has therefore abandoned this argument. *See L & A Contracting Co. v. S. Concrete Servs.,* 17 F.3d 106, 113 (5th Cir. 1994).

Bagoumian further argues that the sentence was greater than necessary under Section 3553(a) because of her lack of a criminal history, her education,

family ties, low risk for recidivism, and current age.  We have previously held that defendants relying on such factors essentially ask us to "reweigh the sentencing factors," which is contrary to the presumption that within-Guidelines sentences are reasonable.  *Hernandez*, 876 F.3d at 166-67.

Finally, Bagoumian argues that her sentence disregards Section 3553(a)(6) by creating a sentencing disparity between her sentence (51 months) and that of Martinez (28 months) and Simmons (15 months).  She argues that the doctors were more essential to the conspiracy and yet received shorter sentences.  The government counters that Martinez and Simmons were respectively associated with only a single clinic while Bagoumian worked at all three clinics, paid cash to the marketers, physically conducted phony medical tests, and was convicted of more than double the substantive counts of health care fraud.  Bagoumian fails to address these distinctions, and she has failed to show that the district court clearly erred in its weighing of the Section 3553(a) factors.

AFFIRMED.